UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN ACZEL
      Plaintiff                      : CIVIL NO. 300 CV 1802 AWT

      V.

LEONARD LABONIA
ETHAN MABLE

      Defendants                  : MARCH 10, 2005

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION IN LIMINE RE: LIFE EXPECTANCY TABLE

I.    **NATURE OF CASE:**

This is a civil rights case brought by the plaintiff, John Aczel, under 42 U.S.C. Section 1983 and under 42 U.S.C. Section 1988 alleging that his Fourth and Fourteenth Amendment rights were violated. Plaintiff alleges that he was falsely arrested and subjected to excessive force on August 10, 1999 by Defendant, Leonard Labonia and Defendant, Ethan Mable, both of whom are police officers of the City of Danbury. Plaintiff alleges that he was subjected to excessive force by Defendant police officers when, without probable cause, the police officers placed him in  unventilated police cruiser in extremely hot weather (causing him to overheat and to experience severe breathing difficulties) and then subsequently repeatedly and violently struck his head, face, and body, pepper sprayed him and placed him under arrest. Plaintiff claims that Defendant police officers had a realistic opportunity to prevent use of excessive force against him but did not do so, and that Defendant police officers denied him adequate medical care despite the obligation of police officers

to provide medical treatment to persons injured by the police by falsely informing medical personnel at Danbury Hospital that he was intoxicated, although Defendant police officers did not seek to perform and did not perform any tests to confirm such claims.

Plaintiff also alleges that Defendant police officers violated the laws of the State of Connecticut. Plaintiff is suing Defendant police officers for violation of the state law tort of Assault and Battery. Plaintiff is also suing Defendant police officers for wrongfully and unlawfully confining him in the police car before assaulting him and later detaining him at the police station, all without reason, justification or authority in violation of the state law tort of False Imprisonment. Plaintiff is also suing Defendant police officers for using the criminal process against him in order to intimidate him from asserting his rights against them and in order to cover up their own wrongdoing and avoid civil and criminal liability for their own acts in violation of the state law tort of Abuse of Process.   As part of the Abuse of Process claim, Plaintiff claims that Defendant police officers arrested him for committing the crime of interfering with a police officer and breach of peace to conceal and excuse their attack on him. Plaintiff further claims that Defendant police officers further attempted to conceal their attack on him by preparing a false police report, (which they knew, and intended, would be forwarded to and relied upon by a prosecutor), and, by falsely informing medical personnel at Danbury Hospital that he was intoxicated, although Defendant police officers did not seek to perform and did not perform any tests to confirm such claims. Plaintiff is also suing Defendant police officers for violation of the state law tort of Intentional Infliction of Emotional Distress.

The Defendant police officers deny liability.  With respect to most of the claims made by Plaintiff, Defendant police officers assert that all of their actions were objectively reasonable under the circumstances.

Plaintiff claims as part of his damages that he was incarcerated for four to five hours, was required to appear in Court as an accused criminal, and was required to spend money to hire an attorney to defend himself against the false charges. Additionally, Plaintiff claims that he suffered a loss of liberty, inconvenience and hu liation, great physical pain and disability, and extreme emotional distress, with associated economic loss. Plaintiff also claims to have suffered a traumatic brain injury, traumatic labyrinthitis, a fracture of the left wrist; traumatic headaches; TMJ injury; a fractured zygomatic arch requiring surgical repair, rib injuries, and a knee injury.

## I.  LAW

### A.   LIFE EXPECTANCY TABLES ARE OFTEN DEEMED AUTHORITAIVE AND REGULARLY USED BY FEDERAL AND STATE COURTS WITHOUT EXPERT TESTIMONY TO AUTHENTICATE THE EXIBIT

Federal Rules of Evidence 803 (17) provides an exception to the hearsay rule for "Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."

"' [S]tatistical charts, such as the mortality tables and work-life expectancy table prepared by the United States Department of Labor ... are often deemed authoritative' and are regularly used by the federal and state courts" (internal citations omitted).  Sales v. Republic of Uganda, 828 F. Supp.1032

(S.D.N.Y. 1993), quoting, <u>Earl v. Bouchard Transportation Co.,</u> 735F. Supp. 1167,1175(E.D.N.Y), aff d in part, rev'd in part on other grounds, 917 F.2d 1320 (2d Cir. 1990); New York Pattern Jury Instruction 2:290 and tables in 1 N.Y. PJI2d Appendix B (1974 & 1991 Supp.).

The Court in, <u>Reiser v. U.S.</u> 786 F. Supp. 1334 (N.D. Ill. 1992), when making its damage determination employed the life expectancy table issued by the U.S. Department of Health and Human Services without expert testimony to authenticate the exhibit. The Court in <u>Reiser</u> stated that "mortality tables are admissible in wrongful death actions on the subject of both the decedent's and next of kin's life expectancy. See Illinois Pattern Jury Instructions (Civil), Instruction No. 31.13, approved in <u>Baird v. Chicago Burlington & Quincy R. R. Co.</u> *63* Ill.2d 463, 471, 349 N.E.2d 413, 417 (1976)."

In <u>Crane vs. Crest Tankers. Inc.</u> 47 F.3d 292 (8th Cir. 1995), appellant appealed the district court's admission into evidence an exhibit entitled "Future Damage Calculator". The exhibit had three components, which included not only the life expectancy table, but a table denoting work life expectancy as well as a method for discounting future damages to present value.    Appellee attempted to offer the exhibit as a means to establish life expectancy. Because Appellee was asking for future damages for pain and suffering and future lost wages, appellee's life expectancy, work life expectancy, as well as present value computations were potentially relevant to issues in the case. Appellant in <u>Crane</u> objected to the exhibit both prior to and during the trial. Specifically, the appellant objected to the device on the grounds that it was hearsay, not properly authenticated, that it constituted improper expert testimony, and that it was not the best evidence.

The issue on appeal was whether it was error for the district court to admit the Future Damage

Calculator into evidence, and if so, whether the error was prejudicial to the appellant requiring

reversal.  The Court in <u>Crane</u> stated that "[t]here are numerous ways of presenting a case involving

future damages. Typically the district court will, as here, take judicial notice of the plaintiffs life

expectancy. If the case involves an issue of future lost wages, generally an expert witness is

employed who, once qualified, opines on various issues including work life expectancy, future

damages, and methods for discounting the same to present value. In the present case, no expert was

used by appellee regarding future economic damages. Nor was an instruction given about them,

other than the fact that the jury was able to award future damages if the facts dictated."  <u>Crane vs.</u>

<u>Crest Tankers. Inc.</u> 47 F.3d 292 (8th Cir. 1995). The Court in Crane stated that "there is no doubt that

life expectancy or mortality tables are often used by attorneys and courts. This is not the case with

regard to the work life expectancy table nor the present value table". Id. In footnote four, the Court

in <u>Crane</u> further stated that "We are not bothered by the admission of the life expectancy table,

particularly as the district court took judicial notice of the appellee's life expectancy ... It has long

been held that life expectancy tables are admissible in damage actions for the 'consideration of the

probabilities of damage over a period of years'. <u>Continental Casualty Company v. Jackson,</u> 400 F.2d

285, 293 (8" Cir 1968)." Id.

    Tables published by the U.S. Department of Labor, Bureau of Labor Statistics and the like,

are generally considered to be reliable by many courts. See, e.g. <u>Boucher v. U.S. Suzuki Motor</u>

<u>Corp.,</u> 73 F.3d 18 (2d Cir. 1996); <u>Mealev v. Slaton Machinery Sales, Inc.</u> 508 F.2d 87 (5th Cir. 1975);

GOLDSTEIN AD PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET · P.O. BOX 1538 · BRIDGEPORT, CT 06601-1538 · TEL. 2031 334-9421 · FAX 12031 334-6949 · JVRIS No. 23640

Sales v. Republic of Uganda, 828 F.Supp. 1032 (S.D.N.Y. 1993); Earl v. Bouchard Tranp. Co., Inc., 735 F.Supp. 1167 (E.D.N.Y. 1990), aff d in part and in part rev'd, and remanded on other grounds, 917 F.2d 1320 (2d Cir.).

**B.** A **TRIER OF FACTS** CAN CONCLUDE, BY INFERENCE, THAT AN **INJURY WILL BE PERMANENT EVEN THOUGH THERE IS NO MEDICAL TESTIMONY EXPRESSLY SUBSTANTIATING THE PERMANENCY.**

The necessity of medical testimony to support a claim for permanent has been enunciated by the Superior Courts of the State of Connecticut, as follows: "A trier of facts can conclude, by inference, that an injury will be permanent even though there is no medical testimony expressly substantiating permanency. See note, 18 A.L.R. 3d 170, 183-84". Royston v. Factor, 1 Conn. App. 576, 474 A.2d 108 (1984); Robinson v. ITT Continental Baking Co, 2 Conn. App. 308 (1984); Gannon v. S.S. Kresge Co., 114 Conn. 36 (1931).

The Court in Royston v. Factor, 1 Conn. App. 576, 474 A.2d 108 (1984), concluded that Plaintiff's injury was permanent without medical testimony. In Royston, supra, one of the issues on appeal was whether the court erred in considering the continued disability and life expectancy of the plaintiff as factors in its award without explicit medical testimony as to permanency. "The medical testimony was that the plaintiff had a markedly decreased range of motion of the cervical spine in all directions and that she had 'a residual initial back injury', but that, as of the date of the trial two years after the accident, it was too soon to determine if there would be 'permanent damage'. The trial court, after noting that problems existed in estimating permanent disability, made its award based on the cost of plaintiffs medical care and other expenses, pain and suffering, continued disability, and the

plaintiffs life expectancy". Id.   The Appellate Court, in <u>Royston,</u> found no error in the trial courts considering the continued disability and life expectancy of the plaintiff as factors in its award without explicit medical testimony as to permanency. The Appellate Court stated that "Compensation to the plaintiff properly included items which, with a reasonable degree of certainty, would exist in the future. <u>Trani v. Anchor Hocking Glass Corporation,</u> 142 Conn. 541, 544, 116 A.2d 167 (1955); <u>Boland v. Vanderbilt,</u> 140 Conn. 520, 523, 102 A.2d 362 (1953). The Court had the opportunity to assess the testimony of the plaintiff and her doctor. It could properly conclude that if the disability still existed two years after the accident, it would in all probability continue.   A trier of facts can conclude, by inference, that an injury will be permanent even though there is no medical testimony expressly substantiating permanency. See note, 18 A.L.R.3d 170, 183-87." Id.

Similarly, the Appeals Court in <u>Parker v. Supermarkets General Co.,</u> 36 Conn. App. 647 (1995), affirmed the decision of the trial court in instructing the jury that it could award plaintiff damages for future pain and suffering if the jury inferred that the aggravation of plaintiffs' preexisting pain was permanent in nature, even though there may not have been medical evidence to that effect.   The Court in <u>Parker</u> explained that "[t]his principle is based on the recognition by Connecticut courts that jurors are able to evaluate for themselves the testimony of the plaintiff, as well as the nature and duration of the injury, the likelihood of its continuance into the future, and the lack of total recovery by the time of trial". Id, citing, <u>Trani v. Anchor Hocking Glass Corp,</u> 142 Conn. 541, 543-44,116 A.2d 167 (1955); <u>Boland v. Vanderbilt,</u> 140 Conn. 520, 523, 102 A.2d 362 (1953). The Court in <u>Parker</u> further explicated that "[i]f a jury has the opportunity to appraise the

condition of a plaintiff and its probable future consequences, an award of damages for permanent injury and for future pain and suffering is proper". Id., citing, <u>Boland</u> <u>v. Vanderbilt,</u> 140 Conn. 520, 523, 102 A.2d 362 (1953).

In <u>Topps vs. Marino,</u> 149 Conn. 145 (1961), the "casual connection between the accident and the original injuries, with their resulting pain and disability, having been proven, the plaintiffs testimony that thereafter they continued to suffer intermittently from the injuries was admissible 'to show the character and extent of the original injury'". See also, <u>Dibble v. Ferguson,</u> 15 Conn. App. 97 (1988).

In <u>Trani v. Anchor Hocking Glass Corporation,</u> 142 Conn. 541, 116 A.2d 167 (1955), the supreme court concluded, in the absence of medical testimony, that since the case was tried before the jury over four years after the occurrence and they saw plaintiff and heard plaintiff testify as to continued pain in her hand, it was not improper for the jury to conclude that, if Plaintiff still had a disability four years after the occurrence, it might reasonably continue into the future.

The Courts of the State of Connecticut have also provided for "An exception to the general rule [requiring] expert medical opinion evidence [on causation] ... when the medical condition is obvious or common in everyday life. <u>State v. Orsini,</u> 155 Conn. 367, 372, 232 A.2d 907 (1967); see also <u>Parker v. Supermarkets General Corp.,</u> 36 Conn. App. 647, 652 A.2d 1047 (1995). Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiffs evidence creates a probability so strong that a lay jury can form a reasonable belief <u>Gannon v. Kresge</u> Co.,114 Conn. 36, 38,157 A. 541 (1931). Expert opinion may also be excused in those cases where

the professional negligence is so gross as to be clear even to a lay person.  <u>Porn v. Henry,</u> 188 Conn.

301, 305,449 A.2d 176 (1982); <u>Slimak v. Foster,</u> 106 Conn. 366, 370, 138 A. 153 (1927). (Internal

quotation marks omitted). <u>Sherman v. Bristol Hospital, Inc.,79</u> Conn. App. 78, 89, 828 A.2d 1260

(2003)." <u>Kalams v. Giacchetto,268</u> Conn. 244, 842 A.2d 1100 (2004).

Furthermore, the Courts of the State of Connecticut have upheld verdicts in which the jury

believed the testimony of plaintiff rather than the contradictory testimony of plaintiff's doctor on the

issue of causation. In <u>Sapiente v. Waltuch,</u> 127 Conn. 224 (1940) Plaintiffs doctor testified that her

illness resulted not from eating macaroni with bugs but from the effect of seeing bugs on her

macaroni after she had eaten them. The Court in <u>Sapiente</u> held that the jury was entitled to believe

the plaintiff rather than her doctor and to find that the plaintiffs illness resulted from eating the

macaroni.

## C.    COURTS CAN ALSO PROPERLY TAKE JUDICIAL NOTICE OF THE PLAINTIFF'S LIFE EXPECTANCY

In the alternative to admitting the Life Expectancy Table, the court can take judicial

notice of Plaintiffs life expectancy. Federal Rule 201, entitled "Judicial Notice of Adjudicative

Facts", provides as follows:

**(a) Scope of rule.**

This rule governs only judicial notice of adjudicative facts.

**(b) Kinds of facts.**

A judicially noticed fact must be one not subject to reasonable dispute in that it is either
(1) generally known within the territorial jurisdiction of the trial court or (2) capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

**(c) When discretionary.**

A court may take judicial notice, whether requested or not.

**(d) When mandatory.**

A court shall take judicial notice if requested by a party and supplied with the necessary information.

**(e) Opportunity to be heard.**

A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

**(f) Time of taking notice.**

Judicial notice may be taken at any stage of the proceeding.

**(g) Instructing** jury.

In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

The Court of Appeals for the 8[0] Circuit, in <u>Crane,</u> found that it was not reversible error for the district court to have taken judicial notice of Plaintiffs life expectancy. <u>Crane v. Crest Tankers. lag=</u> 47 F.3d 292 (8[°]i Cir. 1995).

II. **ARGUMENT**

Plaintiff has disclosed seven experts in this case as follows.

<u>Expert Witness</u>

Dr. Jan Mashman
Associated Neurologists
69 Sand Pit Road, Suite 300
Danbury, CT 06810

Subject Matter of Testimony

Dr. Jan Mashman is expected to testify as to the injuries and trauma suffered by the plaintiff as a result of the August 10, 1999 incident, in accordance with his records and reports previously disclosed. Dr. Maslmian will testify concerning his respective course of treatment for such injuries and trauma, the extent of recovery, permanent partial disabilities and impairments of various bodily functions and body parts and body members as a result of the injuries, and the impact of said permanent partial disabilities and impairments on the plaintiffs future lifestyle, daily activities, and the casual relationship between said injuries and trauma and the subject incident. As a result of the incident described in the complaint, Dr. Mashman will testify that Plaintiff suffered from dizziness, swelling, forgetfulness, coordination problems, weakness of the frontalis causing some obscuration of his left visual field, a fracture of his left zygoma, cervical myofascial pain and decreased vision on the left. Dr. Mashman will also testify that Plaintiff had swelling of his facial fracture regressing his zygomatic arch that had been repaired by Dr. Trusheim. This expert will testify that Plaintiff also suffered from persistent and severe positional vertigo that was exacerbated by bending, looking up, turning over in bed, etc. Dr. Mashman will testify that as a result of the incident more

particularly described in the complaint, Plaintiff found that the eyelashes of his left eye

drooped in front of his visual fields, obscuring his visual acuity. Dr. Mashman will testify

that Plaintiff suffered from post-traumatic labyrinthitis, a left zygomatic arch fracture, and

weakness of the left front talus. This doctor will also testify that he began Plaintiff on a

course of physical therapy and vestibular rehab.    Dr. Mashman will testify that he

conducted an eletroencephalogram on Plaintiff. He will testify that a visual study and a

brain stem auditory study were also conducted on Plaintiff. He will testify that after

testing, Plaintiff showed an abnormal VER study on the right side consistent with an

abnormality of the right visual pathway anterior to the optic chiasm. The EEG was

normal and the BAER was normal. Dr. Maslmian will testify that Plaintiff will be

permanently impaired in that he will continue to suffer from positional vertigo, balance

difficulties, and co-ordination difficulties.


2.      Expert Witness

        Dr. Raphael Schwartz
        Danbury Internal Medicine
        92 Locust Avenue
        Danbury, CT 06810

Subject Matter of Testimony

Dr. Raphael Schwartz is expected to testify as to the injuries and trauma suffered by the

plaintiff as a result of the August 10, 1999 incident, in accordance with his records and

reports previously disclosed. He will testify concerning his respective course of treatment

for such injuries and trauma, the extent of recovery, permanent partial disabilities and ¡mpairments of various bodily functions and body parts and body members as a result of the injuries, and the impact of said permanent partial disabilities and impairments on the plaintiffs future lifestyle, daily activities, and the casual relationship between said injuries and trauma and the subject incident. Dr. Schwartz will testify that as a result of the ¡ncident, more particularly described in the complai t, Plaintiff was rendered acutely incapacitated, in severe pain, involving the face, arms and legs. Plaintiff was barely able to speak due to facial swelling and had difficulty opening his mouth.    This doctor will testify that Plaintiff had ecchymossis and swelling of the right eye and cheek. Dr. Schwartz will testify that Plaintiff had a tender left rib cage and had swelling of both knees, which were also tender to the touch. This expert will testify that Plaintiff, as a result of this incident, was required to wear a splint on his left arm and wrist.   Dr. Schwartz will testify that Plaintiff had problems sleeping and difficulties getting out of bed because of pain in his back. Dr. Schwartz will testify that, Plaintiff suffered from positional vertigo and dizziness. Dr. Schwartz will testify that, Plaintiff suffered from a cervical spine injury. Dr. Schwartz will testify that Plaintiff suffered from a right zygoma fracture, fracture of left 9-10-11 ribs, left kidney trauma, fracture of the left wrist, and patella fracture.  Dr. Schwartz will testify that, he referred Plaintiff to an oral surgeon, Dr. H. Silver, for the fracture of the zygoma, and an orthopedic, Dr. Fish, for the left wrist. Dr. Schwartz will testify that X-rays were taken of Plaintiffs cervical spine, which

GOLDSTEIN AN D PECK, P.C.
ATTORNEYS AT LAW
¡087 BROAD STREET  ·  P.O. Box ¡538  ·  BRIDGEPORT. CT 06601-1538  ·  TEL. 12031 3349421  ·  FAx 12031 334-6949  ·  JuRis No. 23640

showed severe degenerative disc and joint of Luschka changes present from C4 through

C7 and a straightening of the normal cervical lordosis. Dr. Schwartz will also testify that

Plaintiff underwent liver function studies. Dr. Schwartz will testify that a CT scan of the

abdomen showed that Plaintiff had a moderate diffuse fatty infiltration with mild

hepatomegaly and prominent left upper quadrant epigastric vessels raising the possibility

of some degree of portal hypertension. Dr. Schwartz will testify that Plaintiff was

required to undergo surgical correction of the fractured left zygoma and that Dr. Trusheim

did the surgery.


3.      Expert Witness

        Dr. Daniel N. Fish
        Brookfield Orthopedic Associates, P.C.
        60 Old New Milford Road, Suite 3G
        Brookfield, CT 06804

Subject Matter of Testimony

Dr. Daniel N. Fish is expected to testify as to the injuries and trauma suffered by the plaintiff

as a result of the August 10, 1999 incident, in accordance with his records and reports

previously disclosed. He will testify concerning his respective course of treatment for such

¡njuries and trauma, the extent of recovery, permanent partial disabilities and impairments of

various bodily functions and body parts and body members as a result of the injuries, and

the impact of said permanent partial disabilities and impairments on the plaintiffs future

lifestyle, daily activities, and the casual relationship between said injuries and trauma and

the subject incident. Dr. Fish will testify that he treated Plaintiff for the fracture to his left

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET  •  P.O. Box 1536  •  BRIDGEPORT, CT 06601-1538  •  TEL. (203) 334-9421  •  Fᴀx (203) 334-6949  •  JURIS No. 23640

wrist (distal radius fracture). Dr. Fish will testify that, Plaintiff was splinted since the time of the injury. Dr. Fish will testify that Plaintiffs left wrist showed a moderate amount of swelling. Dr. Fish determined that Plaintiff suffered from a left wrist distal radius fracture, minimally displaced, as a result of the incident described in the complaint and placed Plaintiff in a short-arm cast and thereafter in a removable wrist brace.

4.    Expert Witness

Dr. Lewis Trusheim, DDS
Associated Oral and Maxillofacial Surgeons
107 Newtown Road, Suite 1A
Danbury, CT 06810

Subject Matter of Testimony

Dr. Lewis Trusheim  expected to testify as to the injuries and trauma suffered by the plaintiff as a result of the August 10, 1999 incident, in accordance with his records and reports previously disclosed. He will testify concerning his respective course of treatment for such injuries and trauma, the extent of recovery, permanent partial disabilities and impairents of various bodily functions and body parts and body members as a result of the injuries, and the impact of said permanent partial disabilities and impairments on the plaintiffs future lifestyle, daily activities, and the casual relationship between said injuries and trauma and the subject incident. Dr. Trusheim will testify that Dr. Silver referred Plaintiff to him for treatment of the left zygomatic arch fracture sustained in the assault of August 10, 1999. Dr. Trusheim will testify that Plaintiff complained of limited opening

of his jaw and pain in the left side of his face radiating to the ear and temple. Dr.

Tusheim will testify that the CAT scan study from 8-17-99 confirmed the clinical and

panoramic exam diagnoses of a depressed left zygomatic arch fracture. Dr. Tusheim will

testify that on August 27, 1999 an open reduction of the zygomatic arch fracture was

accomplished at the ambulatory surgery unit at Danbury Hospital. This doctor will also

testify that Plaintiff was also experiencing weakness of the muscles of the eyebrow and

upper lid, secondary to inflammation in the area branches of the facial nerve. This expert

will testify that Plaintiff also suffered from bilateral TMJ trauma.

5.     Expert Witness

Harold Silver, DDS
93 West Street, Suite 5
Danbury, CT 06810

Subject Matter of Testimony

Dr. Harold Silver is expected to testify as to the injuries and trauma suffered by the

plaintiff as a result of the August 10, 1999 incident, in accordance with his records and

reports previously disclosed. He will testify concerning his respective course of treatment

for such injuries and trauma, the extent of recovery, permanent partial disabilities and

impairments of various bodily functions and body parts and body members as a result of

the injuries, and the impact of said permanent partial disabilities and impairments on the

plaintiffs future lifestyle, daily activities, and the casual relationship between said

injuries and trauma and the subject incident. Dr. Silver will testify as to the treatment of

Plaintiff with respect to the zygomatic arch fracture that Plaintiff sustained as a result of

the incident described in the complaint.

6.     Expert Witness

Physicians and Staff Danbury Hospital
24 Hospital Street
Danbury, CT 06810

Subject Matter of Testimony

The physicians and staff of Danbury Hospital are expected to testify as to the injuries and

trauma suffered by the plaintiff as a result of the August 10, 1999 incident, in accordance

with their records and reports previously disclosed. They will testify concerning their

respective course of treatment for such injuries and trauma, the extent of recovery,

permanent partial disabilities and impairments of various bodily functions and body parts

and body members as a result of the injuries, and the impact of said permanent partial

disabilities and impairments on the plaintiff's future lifestyle, daily activities, and the

casual relationship between said injuries and trauma and the subject incident. These

experts will testify that Plaintiff was admitted to Danbury Hospital on 8/10/99,

handcuffed, and in the custody of the Danbury Police Department. These experts will

testify that Plaintiff complained of being kicked and struck by the officers. These experts

will testify that there were contusions and abrasions noted to Plaintiff's right temple and

facial area, right arm, and both knees.   These experts will further testify that upon arrival

to the hospital, Plaintiff complained of right shoulder, kidney, face arm, head, back,

abdomen and knee pain. These experts will testify that Plaintiff's eyes were swollen.

These experts will testify that Plaintiff had a contusion of the right eye and cheek and

swelling. These experts will testify that Plaintiff had welling in his face, right periorbital

ecchymosis, and abrasions to the left chin. These experts will testify that Plaintiff had

tenderness of the right shoulder. These experts will testify that Plaintiff was discharged to

the custody of the police and the hospital stressed about the patient's head injury

precautions. These experts will testify that Plaintiff returned to the hospital on August

11, 1999, for evaluation of the right and left TMJ for possible fracture. These experts will

testify that Plaintiff was sent for a CT scan. The diagnostic tests indicated that Plaintiff

was suffering from a fracture of the left wrist and distal forearm and wrist soft tissue

swelling and a fracture of the left zygomatic arch. These experts will testify will also

testify that exam findings showed a bruise in Plaintiffs periorbital area on the right and

tenderness to palpatin of zygoma bilateral with severe pain to palpation of the right

zygomatic arch and rightposterior belly of temporalis muscle.

7.    Expert Witness

        Physicians and Staff
        Danbury Hospital Dental Services
        24 Hospital Street Danbury, CT 06810

Subject Matter of Testimony

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET · P.O. BOX 1538 · BRIDGEPORT, CT 066061536 · TEL. 1203) 3349421 · FAx (203) 3346949 · JURIG No. 23640

The physicians and staff of Danbury Hospital Dental Services are expected to testify as to the injuries and trauma suffered by the plaintiff as a result of the August 10, 1999 incident, in accordance with their records and reports previously disclosed. They will testify concerning their respective course of treatment for such injuries, and trauma, the extent of recovery, permanent partial disabilities and impairments of various bodily functions and body parts and body members as a result of the injuries, and the impact of said permanent partial disabilities and impairments on the plaintiffs future lifestyle, daily activities, and the casual relationship between said injuries and trauma and the subject incident. These experts will testify that a Panorex view revealed findings of probable bilateral condyle fractures. They will also testify that Plaintiff was given six Percocet tablets to take home with him.

In addition to expert testimony, in this case, the Plaintiff, John Aczel will testify regarding his restrictions, discomfort, limitations and continuing disabilities that he continues to suffer from five years post the incident of August 10, 1999. For instance, Plaintiff will testify that as a result of the fractured left wrist that lie sustained in the incident he continues to experience, five years post the incident, weakness in his wrist. Plaintiff will also testify that he sustained positional vertigo as a result of the incident of August 10, 1999, and that he continues, five years post incident, to experience positional vertigo causing severe and persistent dizziness that is exacerbated by bending, looking up, and turning over in bed. Plaintiff will testify that he continues to experience difficulty

GOLDSTEIN AN D PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET  •  P.O. BE. IS38  •  BRIDGEPORT. CT 06601-1538  •  TEL. 12031 334-9421  •  FAA 2031 334-6949  •  JURIS No. 23640

with his balance, co-ordination and forgetfulness. Plaintiff will also testify that he continues to experience weakness of the muscles of the eyebrow and upper lid, which were injured in the August 10, 1999 incident. Plaintiff will testify that, five years post the incident, the eyelashes of Plaintiffs eye continue to randomly droop in front of his visual fields, obscuring his visual acuity because of the continued weakness of his left front talus.

Plaintiff has identified experts who will testify as to permanency. However, even assuming arguendo that none of the expert witness identified by Plaintiff testify that Plaintiff sustained a permanent disability as to any of the injuries claimed by Plaintiff, the jury can nonetheless conclude, by inference, that certain injuries will be permanent from the testimony of Plaintiff, who will testify that he continues to be disabled, in various ways, five yeas post incident. See, <u>Royston v. Factor,</u> supra, <u>Robinson v. ITT Continental Banking Co,</u> supra; <u>Gannon v. S.S. Kresge Co.,</u> supra; and <u>Parker v. Supermarkets General Co.,</u> supra.  The jury will have the opportunity to appraise the condition of plaintiff at trial. The jury may even visually see Plaintiff's eyelid randomly droops over his eye and obscure his vision during Plaintiffs testimony. The jury will be able to appraise the probable future consequences of the injuries claimed by Plaintiff and therefore an award for damages and permanent injury for future pain and suffering is proper. See <u>Parker v. Supermarkets General Co,</u> supra and <u>Trani v. Anchor Hocking Glass Corporation,</u> supra.

The testimony of Aczel along with medical records and any expert testimony produced at trial will provide the jury with an adequate assessment of Aczel's medical impairment.    Given that assessment, flee jury could conclude that Aczel is permanently disabled, by determining the effects of

GOLOSTEIN  AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET · P.O. Box 1538 · BRIDGEPORT. CT 06601-1538 · TEL. (203) 334-9421 · Fro 1 2031 334-6949 · JuRIs No. 23640

Aczel's physical impairments in the context of his "personal, social, and occupational demands".

The word "disability" in not uniquely associated with a medical diagnosis, such that only a qualified medical expert may used that term. A disability may be established through the testimony other than a doctor. The courts in the State of Connecticut have noted a distinction between a disability and an impairment rating. The extent of loss of use does not necessarily equal the extent of medical impairment. A permanent medical impairment rating is directly related to the health status of an individual but disability can be determined within the context of the personal, social, occupational demands, or statutory or regulatory requirements that an individual is unable to meet as a result of the disability.

Thus, the jury can make an award for continued disability in this case. The Federal Rules of Evidence 803 (17) provides an exception to the hearsay rule for life expectancy tables and such tables are generally deemed authoritative and regularly used by federal and state courts without expert testimony to authenticate the exhibit. See Sales <u>v. Republic of Uganda,</u> supra, <u>Reiser v. U.S.,</u> supra, <u>Crane vs. Crest Tanker, Inc.,</u> supra; <u>Boucher v. U.S. Suzuki Motor Corp.,</u> supra. Thus, this Court must allow Plaintiff to introduce the Life Expectancy Table into evidence as a full exhibit. In the alternative, this Court must take judicial notice of the Life Expectancy Table of Plaintiff under Federal Rule 201.


III.    **CONCLUSION**

Based on the foregoing, the plaintiff respectfully requests that this Court deny the

GOLOSTE N AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. Box 1538 • BRIDGEPORT. CT 06601-1538 • TEL. 12031 334-9421 • FAX 12031 334-6949 • JuR15 No. 23640

Defendants' Motion in Limine, and allow the plaintiff to introduce the Life Expectancy Table as a

full exhibit at trial. In the alternative, Plaintiff requests that the Court takes judicial notice of

Plaintiff's Life Expectancy under Federal Rule 201.


                    PLAINTIFF,
                    JOHN ACZEL

                    BY _____
                        Tiziana M. Scaccia
                        Goldstein and Peck, P.C.
                        1087 Broad Street, P.O. Box 1538
                        Bridgeport, CT 06601-1538
                        (203) 334-9421
                        (203) 334-6949 (fax)
                        ct08713

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, U.S. Mail to the following counsel of record this 10 $^{\circ i}$ day of March, 2005

John J. Radshaw, III, Esquire
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114

_____
Tiziana M. Scaccia

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET  ·  P.O. Box IS38  ·  BRIDGEPORT. CT 06601-1538  ·  TEL. (203) 334-9421  ·  Fwc 12031 334-6949  ·  JuRis No. 23640