UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN ACZEL
     Plaintiff                      : CIVIL NO. 300 CV 1802 AWT

     V.

LEONARD LABONIA
ETHAN MABLE
 and CITY OF DANBURY
     Defendants                : MARCH 10, 2005

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANTS MOTION IN LIMINE RE: TESTIMONY OF DIANE FERNANDEZ

I.    **Nature of Case:,**

      This is a civil rights case brought by the plaintiff, John Aczel, under 42 U.S.C. Section 1983 and under 42 U.S.C. Section 1988 alleging that his Fourth and Fourteenth Amendment rights were violated. Plaintiff alleges that he was falsely arrested and subjected to excessive force on August 10, 1999 by Defendant, Leonard Labonia and Defendant, Ethan Mable, both of whom are police officers of the City of Danbury. Plaintiff alleges that he was subjected to excessive force by Defendant police officers when, without probable cause, the police officers placed him    an unventilated police cruiser in extremely hot weather (causing him to overheat and to experience severe breathing difficulties) and then subsequently repeatedly and violently struck his head, face, and body, pepper sprayed him and placed him under arrest, Plaintiff claims that Defendant police officers had a realistic opportunity to prevent use of excessive force against him but did not do so, and that

Defendant police officers denied him adequate medical care despite the obligation of police officers to provide medical treatment to persons injured by the police by falsely informing medical personnel at Danbury Hospital that he was intoxicated, although Defendant police officers did not seek to perform and did not perform any tests to confirm such claims.

Plaintiff also alleges that Defendant police officers violated the laws of the State of Connecticut. Plaintiff is suing Defendant police officers for violation of the state law tort of Assault and Battery. Plaintiff is also suing Defendant police officers for wrongfully and unlawfully confining him in the police car before assaulting him and later detaining him at the police station, all without reason, justification or authority in violation of the state law tort of False Imprisonment. Plaintiff is also suing Defendant police officers for using the criminal process against him in order to ¡ntimidate him from asserting his rights against them and in order to cover up their own wrongdoing and avoid civil and criminal liability for their own acts in violation of the state law tort of Abuse of Process.   As part of the Abuse of Process claim, Plaintiff claims that Defendant police officers arrested him for committing the crime of interfering with a police officer and breach of peace to conceal and excuse their attack on him. Plaintiff further claims that Defendant police officers further attempted to conceal their attack on him by preparing a false police report, (which they knew, and ¡ntended, would be forwarded to and relied upon by a prosecutor), and, by falsely informing medical personnel at Danbury Hospital that he was intoxicated, although Defendant police officers did not seek to perform and did not perform any tests to confirm such claims. Plaintiff is also suing

Defendant police officers for violation of the state law tort of Intentional Infliction of Emotional Distress.

The Defendant police officers deny liability.   With respect to most of the claims made by Plaintiff, Defendant police officers assert that all of their actions were objectively reasonable under the circumstances.

Plaintiff claims as part of his damages that he was incarcerated for four to five hours, was required to appear in Court as an accused criminal, and was required to spend money to hire an attorney to defend himself against the false charges. Additionally, Plaintiff claims that he suffered a loss of liberty, inconvenience and humiliation, great physical pain and disability, and extreme emotional distress, with associated economic loss. Plaintiff also claims to have suffered a traumatic brain injury, traumatic labyrinthitis, a fracture of the left wrist; traumatic headaches; TMJ injury; a fractured zygomatic arch requiring surgical repair, rib injuries, and a knee injury.

II.   **Law** **and Argument**

The Federal Rules of Civil Procedure provide, '[i]n every trial, the testimony of witnesses shall be taken in open Court, unless a federal law, these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court provide otherwise." Fed. R. Civ. P. 43.

Plaintiff has certainly disclosed the witness, Mrs. Fernandez, to Defendants prior to the disclosure made in the Joint Trial Memorandum. No depositions were conducted in this case prior to March 8, 2002. Plaintiff was the second witnesses to be deposed in this case on March 8, 2002. On March 8, 2002, the parties began the deposition of Leonard Labonia and interrupted

said deposition to commence and complete the deposition of John Aczel. Depositions were

taken, in this case through May 16, 2002 and the deadline to complete discovery in this case was

extended until May 30, 2002 pursuant to endorsement dated May 1, 2002, granting Motion 18-1,

"Motion to Extend Time to Complete Discovery". Plaintiff testified during his deposition that

Mrs. Fernandez, picked him up from the police station after he was booked and processed and

took him back to the hospital. See, pages 159-164 of Mr. Aczel's deposition transcript attached

hereto.  Mrs. Fernandez was in fact disclosed to Defendants well in advance of the deadline to

conduct depositions in this case.

  The only objection articulated in Defendants' Motion in Limine regarding the testimony

to be given by the witness, Mrs. Fernandez, is Defendants' claim that Mrs. Fernandez was not

disclosed as a witness prior to the filing of the Joint Trial Memorandum. This objection is

baseless in light of the deposition testimony of Mr. Aczel. As Defendants' have not articulated

any other objections in reference to the testimony to be given by Mrs. Fernandez, this court must

deny the Motion in Limine.

  Moreover, by pleading filed simultaneously herewith, Plaintiff requests the Court to

consider and grant Plaintiffs Motion for Permission to file Motion in Limine and Plaintiff's

Motion in Limine, regarding the testimony of the following lay witnesses disclosed for the first

time by Defendants in the Joint Trial Memorandum: Officer Joseph Riolo, Danbury Police

Department, Officer Karl Murphy, Danbury Police Department, John Reed, EMS, Danbury ER

Dept., "Matt C", EMS, Danbury ER Dept. Sgt. Brian Merrick, Danbury Police Department, and

David Owen, Precision.    With exception to Officer Murphy, whom Defendants identified in

their depositions as occupying a backup vehicle that arrived at the scene of the incident,

Defendants did not disclose any of the other aforementioned witnesses, prior to the discovery

deadline.


III.    **CONCLUSION**

     Based on the foregoing, the plaintiff respectfully requests that this Court deny the

Defendants' Motion in Limine, and allow the plaintiff to introduce the testimony of Mrs. Diane

Fernandez at trial.

                         PLAINTIFF,
                         JOHN ACZEL

                         BY_____

                           Tiziana M. Scaccia
                           Goldstein and Peck, P.C.
                           1087 Broad Street, P.O. Box 1538
                           Bridgeport, CT 06601-1538
                           (203) 334-9421
                           (203) 334-6949 (fax)
                           ct08713

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, U.S. Mail to the following counsel of record this 10"[i] day of March, 2005

John J. Radshaw, III, Esquire
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114

_____
Tiziana M. Scaccia

```
1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF CONNECTICUT

3

     JOHN ACZEL,

                     Plaintiff
5        VS.                              3:00-CV-1802(AWT)

6    LEONARD LABONIA, ETHAN MABLE
     and CITY OF DANBURY,
7
                     Defendants        APRIL 23, 2002
8

9            CONTINUED DEPOSITION OF JOHN ACZEL

10

     APPEARANCES:
11
         For the Plaintiff:
12
             GOLDSTEIN & PECK, P.C.
13           1087 Broad Street
             Bridgeport, Connecticut 06601-1538
14       BY;  TIZIANA SCACCIA, ESQ.

15       For Defendants Leonard Labonia and Ethan Mable:

16           HOWD & LUDORF
             65 Wethersfield Avenue
17           Hartford, Connecticut 06114
         BY:  THOMAS R. GERARDE, ESQ.
18
         For the Defendant City of Danbury:
19
             MAHER & MURTHA, LLC
20           582 Clinton Avenue
             Bridgeport, Connecticut 06605
21       BY:  MARK A. PERKINS, ESQ.

22       Also Present:  Mr. Steven Schwarcz
                        Interpreter
23

24
                        Paul Collard
25              Registered Diplomate Reporter
```

1                      · · Continued Deposition of JOHN ACZEL,

2          taken on behalf of the Defendants i the hereinbefore

3          entitled action, pursuant to Notice and the Federal

4          Rules of Civil Procedure, before Paul Collard, RDR,

5          duly qualified Notary Public in and for the State of

6          Connecticut, at the offices of Goldstein & Peck, 1087

7          Broad Street, Connecticut, commencing at 1:45 p.m. on

8          Tuesday, April 23, 2002.

9

10

11

12

13

14                              STIPULATIONS

15                  It is hereby stipulated and agreed by and
           among counsel for the respective parties that all
16         formalities in connection with the taking of this
           deposition, including time, place, sufficiency of
17         notice and the authority of the officer before whom it
           is being taken may be and are hereby waived.
18
                   It is further stipulated and agreed that
19         objections, other than as to form, are reserved to the
           time of trial and that the reading and signing of the
20         deposition is waived.

21                  It is further stipulated and agreed that the
           proof of the qualifications of the notary public
22         before whom the deposition is being taken is hereby
           waived.
23

24

25

1    talk back, you know. Just give me the question: "You want

2    using the telephone?" You know.

3        Q    Tell me about the telephone again. What did they

     say?

5        A    "You want call somebody?"

6        Q    They asked you if you would like to make a phone

7    call?

8            Yes.

9        Q    Did you make a phone call?

10           Yes.

11       Q    Who did you call?

12           My wife.

13       Q    All right.  And what did you tell your w fe?

14       A    Had to bring down a thousand dollars because I

15   got the bond a thousand dollars.

16       Q    Okay.  And how long after your phone call did

17   your wife come with the money?

18       A    Not my wife.  My friend.  I don't know when he

19   come down, but they put me in the jail and I don't know how

20   long I was in the jail.

21       Q    What's the name of your friend that  came down

22   with the money?

23       A    It's Fernandez.

24       Q    What's Mr. Fernandez's first name?

25           Pepe.

1      Q    Where does Mr. Fernandez live?

       A    Down the street, Davis. 50 -- I don't know the

3   number of the street.

       •    I'm sorry.  What address?

5      A    I don't know the numbers. Davis Street. Let's

6   see.

       •    Somewhere in the 50's of Davis Street?

8      A    Yes.

9      •    Is that what you said?

10     A    Yeah.

11              MS. SCACCIA:   Oh.

12     A    Maybe 60, close to 60.

13   BY MR. GERARDE:

14     Q    Did the police say anything else to you after

15   they asked you if you wanted a phone call?

16     A    I don't understand.

17              (Interpreter translated to the witness).

18              No.   They put me i the jail.

19     Q    All right.  Did you ever talk to the police about

20   what happened that day at your home?

21     A    No.

22     •    Did anyone ever ask you to make a statement?

23     A    No.   Even they don't know what is the charge.

24   They talking to each other. Okay? And one of them was to

25   another one: "Don't worry, I fix it."

1      Q    You have to tell me what you meant by that.

2      A    I don't know who the officers over there, two or

3   three, sometimes four.

       Q    Did you see Officer Labonia there?

5      A    Yes.

6      Q    And you're saying Officer Labonia said something

7   that you heard?

B      A    Not this conversation.   This another officer

9   talking to each other.

10     •    So you say you saw officers talking to each

11  other?

12     A    Yes.

13     •    Are you able to tell me the name of any of those

14  officers?

15     A    I don't know.  I don't know.

16     Q    If it was officer Mable or Officer Labonia, you

17  would know?

18     A    Yeah.  I know, yes,   the face.  But not another

19  officer, you know.

20     Q    So it wasn't officer Labonia or Officer Mable

21  that was talking -

22     A    No.

23     •    -- at this time you're talking about now?

24          Yes.

25     •    When Mr. Fernandez came, did you have to sign

1    some paperwork in order to get out?

2         A    Yeah.   Yes.

3         •    And did you do that?

4         A    Yes.

5         Q    When you signed the paperwork in order to get

6    out, did the police ask you anything about what happened

7    that day?

8         A    No.

9         •    Did they ask you to make a statement?

10             No.

11        •    Did you ever tell them that you wanted to make a

12   statement?

13        A    No.

14        •    Were you able to talk at that time?

15             Yeah, I was able talking, but I was so pain, you

16   know, even I don't want to talk, you know, I just want to

17   get out and go in the hospital.

18        •    Now, at any time when you were in the police

19   station, either before you went to the hospital or after,

20   were you feeling the effects of alcohol?

21             In other words, were you under the influence of

22   alcohol at the time you were in the police station?

23        A    No.

24        •    Did you raise your voice at all and yell at any

25   time when you were in the police station?

```
1        A    I couldn't talk.
2        •    Did you raise your voice and yell at any time
3   when you were in the hospital?
         A    No.
5        •    And when your voice did come back when you were
6   in the police station after you came back from the
    hospital, did you ever raise your voice and yell?
8             No.
9        •    How did you get to your home when you left the
10  police station?
11            My friend take me to hospital.
12       •    Mr. Fernandez?
13            And the wife.
14       •    And his wife?
15            Yes.   No, and the wife, she take me.
16       •    I'm sorry, I missed it.
17                 MS. SCACCIA:   I think his testimony i the
18            friend's wife took him to the hospital.
19                 THE WITNESS:   Yes.
20                 MS. SCACCIA:   Is that what you're trying to
21            say?
22                 THE WITNESS:   Yes.
23                 MS. SCACCIA:   That's what I thought I heard.
24  BY MR. GERARDE:
25       Q    Okay.   When you left the police station after
```

```
1   Mr. Fernandez came,

2            Yes.

3       •      where did you go?

             In the hospital.

5       •    You went back to the hospital?

6            Yes.

        •    Same hospital?

8            Same.

9       •    All right.  And what happened when you arrived at

10  the hospital?

11      A    The doctor said, "You was over here." I said

12  yeah, I was over here, you know.

13      •    The doctor recognized you?

14           No.

15      •    But you think -

16      A    That's a different doctor.

17      •    Well, you just told me the doctor said you were

18  already here?

19      A    Yes, because in the computer show, you know, I

20  was over there.

21      •    Okay.

22           A couple hours ago, you know.

23      •    All right.  And did you speak to a nurse when you

24  arrived?

25      A    Yes.
```