UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN ACZEL | : |
|     Plaintiff | : CIVIL NO. 300 CV 1802 AWT |
| | : |
| V. | : |
| | : |
| LEONARD LABONIA | : |
| ETHAN MABLE | : |
|  and CITY OF DANBURY | : |
|     Defendants | : MARCH 21, 2005 |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MEMORANDUM IN OPPOSTION TO PLAINTIFF'S MOTION IN LIMINE RE: POLICE REPORT**

**A. ALLEGATION THAT GRETCHEN OLSEN WAS A CO-COMPLAINANT IN THE POLICE REPORT**

1. Gretchen Olson will likely NOT testify at trial in that Defendants have informed Plaintiff's counsel that she is likely committed to a mental health institution and/or in prison. Any statements made by Gretchen Olsen are hearsay statements. Indications in the police report referring to Gretchen Olsen as a co-complainant is hearsay.

    Moreover, Defendants have not plead probable cause as an affirmative defense in this case. Federal Rules of Civil Procedure, 8 (c) entitled "Affirmative Defenses", provides:

Page 1 of 8

In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. [emphasis added]. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

"The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed. See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971); see also Williams v. Ashland Eng'g Co., 45 F.3d 588, 593 (1st Cir. 1995) ('The purpose of Rule 8(c) is to give the court and the other parties fair warning that a particular line of defense will be pursued.'); Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989) ('The Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it.') (citing Blonder-Tongue); Marino v. Otis Eng'g Corp., 839 F.2d 1404, 1408 (10th Cir. 1988) ('The purpose behind rule 8(c) . . . [is to] put[ ] 'plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance.') (citations omitted); Perez v. United States, 830 F.2d 54, 57 (5th Cir. 1987) ('The central purpose of the Rule 8(c)

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS NO. 23640

requirement that affirmative defenses be pled is to prevent unfair surprise. 'A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.' ). Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer. Rule 12(b) states that '[e]very defense . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion . . . .'"Robinson v. Johnson, No. 00-1979 (3rd Cir. 2002).

Defendants have not plead probable cause as an affirmative defense in their special defenses to Plaintiff's complaint. The Second Circuit in Curry v. City of Syracuse, No. 01-9211 (2nd Cir 2003), states:

"'Furthermore, when an arrest is made without a warrant, the officer has acted outside the scope of the legal process and therefore a rebuttable presumption arises that such an arrest is unlawful. The defendant has the burden of raising and proving the affirmative defense of probable cause.' Rodriguez v. City of New York, 149 Misc.2d 295, 296, 563 N.Y.S.2d 1004, 1005 (N.Y. Sup. Ct. 1990) (citing Broughton v. State, 37 N.Y.2d 451, 458, 335 N.E.2d 310, 315, 373 N.Y.S.2d 87, 94 (1975)). Probable cause is 'a complete defense to a cause of action for false arrest.' Feinberg v. Saks & Co., 56 N.Y.2d 206, 210, 436 N.E.2d 1279, 1280, 451 N.Y.S.2d 677, 678 (1982). Lynch pled probable cause as an affirmative defense."

Having failed to plead probable cause as an affirmative defense to the complaint, Defendants can not introduce as part of the police report statements by Gretchen Olsen

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS No. 23640

and Veronica DeRosa-Stefano to show its effect on the listener, Officer Labonia, in connection with their efforts to show that they had probable cause or reasonable suspicion to detain, stop or arrest Plaintiff. Because the affirmative defense was not plead, such evidence is not admissible to establish the defense.

**B.  AS TO ANY NON PARTY STATEMENTS AND AS TO ANY REFERENCES AS TO PLAINTIFF'S ALLEGED INTOXICATION IN THE POLICE REPORT:**

1. For purposes of responding to arguments made by Defendants in their Memorandum in Opposition to Plaintiff's Motion in Limine re: the Police Report, pages 1-8, Plaintiff incorporates herein and makes a part hereof, as if more fully set forth herein Plaintiff's Response to Defendants' Memorandum in Opposition to Plaintiff's Motion in Limine Re: Lay Witness Testimony of Matt C. and John Reed at EMS, Danbury Emergency Room Department filed on even date herewith.

2. Also, for purposes of responding to arguments made by Defendants in their Memorandum in Opposition to Plaintiff's Motion in Limine re: the Police Report, pages 1-8, Plaintiff incorporates herein and makes a part hereof, as if more fully set forth herein, Plaintiff's Response to Defendants' Memorandum in Opposition to Plaintiff's Motion in Limine Re: Allegation that Plaintiff was intoxicated and allegations of

Page 4 of 8

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS NO. 23640

complaint of sexual assault and allegations that Gretchen Olsen was a co-complainant filed on even date herewith.

3. Any non party statements and/or references to Plaintiff's alleged intoxication in the police report is not reliable and trustworthy for the same reasons set forth in Paragraphs one and two above.

4. Any non party statements and/or references to Plaintiff's alleged intoxication in the police report are not based on scientific, technical, or specialized knowledge in that no tests were conducted on Plaintiff to determine whether or not he was intoxicated.

5. Federal Rule 404 (b) excludes any non party statements and/or references to Plaintiff's alleged intoxication in the police report for the same reasons set forth in paragraphs one and two above.

6. Federal Rule of Evidence 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

For all of the foregoing reasons, stated in Paragraphs 1-5, above, any statement in the police report regarding the alleged intoxication of Plaintiff in this case must be excluded

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS NO. 23640

because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

### C. REFERENCES AND/OR STATEMENTS AS TO SEXUAL TOUCHING, SEXUAL GESTURES AND ADVANCES IN THE POLICE REPORT

Section A above is incorporated herein. Since Defendants have not pled probable cause as a special defense, they can not produce evidence, via statements in the police report of Gretchen Olsen or Veronical DeRosa-Stefano, to support the defense (which was not affirmatively pled by Defendants) that Officer Labonia had reasonable suspicion to detain, stop, or arrest the Plaintiff.

### D. REFERENCES AND/OR STATEMENTS OF OTHER NON PARTY WITNESSES IN THE POLICE REPORT

Section A above is incorporated herein. Since Defendants have not pled probable cause as a special defense, they can not produce evidence, via statements in the police report of other nonparty witnesses, to wit, that Plaintiff sexually or offensively touched them, to support the defense (which was not affirmatively pled by Defendants) that Officer Labonia had reasonable suspicion to detain, stop, or arrest the Plaintiff.

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS No. 23640

### E. THERE ARE TWO VERSIONS OF THE POLICE REPORT

There are differences in the two versions of the police report despite Defendants statement in their Memorandum in Opposition to Plaintiff's Motion in Limine RE: Police Report, at page 7. Attached hereto is relevant sections of the other police report which are not identical to the police report attached to Defendants Memorandum in Opposition to Plaintiff's Motion in Limine RE: Police Report. Despite Defendants contrary allegations at page 5 of their Memorandum in Opposition to Plaintiff's Motion in Limine RE: Police Report, the police reports are not only unreliable and lack trustworthiness because there are two versions of the police report but because Plaintiff alleges that Defendants fabricated the police report to conceal Defendants' attack on him and are now attempting to use the document they fabricated against Plaintiff.

PLAINTIFF,
JOHN ACZEL

BY _____
Tiziana M. Scaccia
Goldstein and Peck, P.C.
1087 Broad Street, P.O. Box 1538
Bridgeport, CT 06601-1538
(203) 334-9421
(203) 334-6949 (fax)
Ct08713

Page 7 of 8

### **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, U.S. Mail to the following counsel of record this 21st day of March, 2005.

John J. Radshaw, III, Esquire
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114

_____
Tiziana M. Scaccia

Page 8 of 8

GOLDSTEIN AND PECK, P.C.
ATTORNEYS AT LAW
1087 BROAD STREET • P.O. BOX 1538 • BRIDGEPORT, CT 06601-1538 • TEL. (203) 334-9421 • FAX (203) 334-6949 • JURIS No. 23640

INCIDENT REPORT



NO. 99-22746

DATE: 8/10/99 @ 1700

BREACH OF PEACE, 53a-181; INTERFERING 53a-167a

Officer Leonard LaBonia, Badge 524

42 Highland Avenue, Danbury

```
D2 - Complainant - Veronica DeRosa - 3/10/72 - 744-6512
     Complainant - Gretchen Olsen  - 7/23/65 - 744-6512

D1 - Arrested    - John Aczel      - 9/22/45
```

On 8/10/99 I was dispatched to 42 Highland Avenue in reference to a dispute. This address is occupied by the Goulash Place Restaurant as well as 2 apartments. The complainants, DeRosa and Olsen, reside in the second floor apartment. The arrestee, John Aczel, is the owner of the restaurant and owner of the building. Aczel resides in the first floor apartment at 42 Highland Avenue. Upon arrival I pulled into the restaurant parking lot which is behind the building. As I pulled in I observed Aczel yelling and shouting obscenities. He appeared to be yelling at two females, DeRosa and Olsen, who were washing a car in the parking lot approximately twenty feet away from Aczel. I then exited my vehicle and approached Aczel. He was obviously upset and continued shouting obscenities at DeRosa and Olsen. I could smell a strong odor of an alcoholic beverage on Aczel's breath. From his movements and his inability to stand up straight it was obvious that Aczel was intoxicated. I asked Aczel what the problem was and he stated that he has been having problems with his tenants DeRosa and Olsen. I then asked Aczel to come with me to speak with DeRosa and Olsen. Aczel and I then walked over to DeRosa and Olsen. DeRosa and Olsen stated that they have been having problems with Aczel ever since they moved into the second floor apartment. They further stated that Aczel continually grabs them from behind and makes sexual gestures and advances at them. Olsen then stated that she intends to vacate the apartment with DeRosa September 15. After hearing

Page 2

Olsen's and DeRosa's comments, Aczel stormed into a rage of anger. He again began yelling and shouting obscenities at Olsen and DeRosa calling them "fucking sluts" and "fucking bitches." Aczel then turned around and began to walk away from us. I requested for Aczel to return back so we could work this out, however, he refused to listen and continued walking towards the entrance to the restaurant. As Aczel was walking away he was becoming louder and continued shouting obscenities. Aczel was so loud that neighbors

from across the street at 50 Davis Street came across the street to the area of the dispute to see what was going on. I asked Aczel to come back and discuss this incident four times, but he kept walking towards the entrance of the restaurant. Aczel's obscene language and actions, which was a distraction for neighbors and kids playing in the area, had clearly caused a breach of peace. I grabbed onto Aczel as he approached the entrance into the restaurant and informed (sic) that he was not going into the restaurant. I told Aczel that he was going to be placed in the rear of my vehicle until I figured out what had transpired prior to my arrival. Aczel was then placed in the rear of my vehicle. At this point I was still unsure if any crimes had been committed by Aczel prior to my arrival. I was unable to hear DeRosa's and Olsen's entire complaint because Aczel walked away when he heard accusations made against him regarding sexual gestures or advances he was making towards the complainants. Once Aczel was secured in the rear of my vehicle I proceeded towards DeRosa and Olsen. As I began talking with DeRosa and Olsen I saw Aczel kicking the left rear window of my vehicle with his feet. As I proceeded towards my police vehicle Aczel then began banging his head against the left rear window. Aczel did this several times before I was able to gain access to my vehicle. Aczel's actions made it appear as though he was going to break the glass and injure himself. Aczel hit his head against the left rear window so hard that the glass bowed out slightly. I then opened the back door with the intent of arresting Aczel for creating the breach of the peace before he was placed in the rear of my vehicle. Once the door was opened Aczel jumped out and immediately attempted to punch me in the face with a closed fist. I was within one foot from Aczel and grabbed his left hand and attempted to place a handcuff on it. Aczel became uncontrollable pushing me and attempting to get away from my hold. Aczel was able to break free of the hold I had on his left hand and continued pushing and kicking me. I then advised dispatch to send me backup. I continually told Aczel to "stop resisting", however he kept fighting. After several attempts to take Aczel into custody and his attempted assaults on me, I again radioed dispatch. I advised dispatch to send multiple back up units. "Code 1". This meant that I was requesting an immediate back up

Page 3

response. Attempts to place Aczel on the ground were unsuccessful. As Aczel turned to face me he grabbed onto me. I then struck Aczel in the face with my fist. I was then able to place Aczel on the ground so that I could attempt to take him into custody. This was also unsuccessful. Once on the ground Aczel fell to his stomach and tucked his hands in against his chest. As I tried to pull his head out he attempted to strike me in the face with his elbows. Aczel was also kicking me with the heels of his feet as I was on his back. Aczel refused to be handcuffed. Family members and friends of Aczel then began approaching me yelling for me to let go of him. While on the ground Aczel made several attempts to push me off him to escape. I was finally able to turn Aczel on his right side. I again attempted to grab and handcuff his left hand,

however he tried again to punch me in the face. The situation had quickly gone out of control and Aczel's actions were making me fear for my safety. I had exhausted every possible attempt to take Aczel into custody.

Being familiar with the effects of pepper spray from training and experience I sprayed a one second burst into Aczel's face. I did this to prevent Aczel from fleeing the scene and increasing the intensity of his combativeness. The pepper spray appeared to have no effect on Aczel. He continued fighting and resisting arrest. I then picked Aczel up from the ground and placed him against my police vehicle. I did this because I thought that I would have a better chance of separating Aczel's hands and placing him in handcuffs. This was also unsuccessful. Officer Moble arrived at this point. Officer Moble was the first officer to arrive as a back up unit. Officer Moble and I attempted to handcuff Aczel as he was standing up against my vehicle. However Aczel continued to fight and resist arrest. Officer K. Murphy, Officer Riolo as well as several other police officers arrived on the scene to assist. Office K. Murphy, Officer Moble and I were then able to take Aczel into custody. He was handcuffed and placed into the rear of my vehicle. Sgt. Merrick then arrived on scene to assist.

After being secured in the rear of my vehicle, Aczel was transported to Headquarters. Throughout the duration of his ride to Headquarters Aczel continued to bang his head on the center glass which separated the front seat from the back.

Upon arrival at Headquarters I was met by the ambulance who had been called by Officer Murphy. Aczel complained to Murphy at the scene that he was having trouble breathing after being sprayed with pepper spray. The paramedics then transported Aczel to the hospital. Officer Murphy rode with the paramedics to the hospital. After being treated at the hospital, Aczel was returned to Headquarters. He was then processed and released on a $1,000.00 bond for breach of peace and interfering with duties of a police officer. Aczel was given a court date of 8/18/99.

Page 4

It should be noted that Aczel did not cause any damage to my police vehicle. Investigation indicates that Aczel and DeRosa and Olsen were involved in a verbal argument. Olsen stated that Aczel was mad about her wanting to move from the apartment and put a lock on the laundry room. This made it impossible for Olsen and DeRosa to access the laundry room. Olsen stated that the washer and dryer in the laundry room belong to her. She also stated that she has always been permitted to use these facilities. Olsen and DeRosa stated that on this date Aczel yelled and shouted obscenities at them when they requested access to the laundry room. Both DeRosa and Olsen stated that only a verbal dispute took place with Aczel on this date.
End
Attached is a Gerstein v. Pugh affidavit

INCIDENT REPORT - ETHAN MOBLE                                #515

On the above date and time, while on patrol on Park Avenue, I heard Officer LaBonia calling for back up at the above location. I responded to that location and when I arrived, a (sic) found Officer LaBonia struggling on the ground with an older white male, later identified as Mr. Aczel (sic).

Officer LaBonia was able to get Mr. Aczel (sic) off the ground and both Officer LaBonia and myself brought the man to the hood of Officer LaBonia (sic) cruiser. Officer LaBonia managed to get one handcuff on Mr. Aczel (sic), but was unable to cuff the second hand. As we were trying to hold Mr. Aczel down, he kept rearing his upper body so that he could free himself. In order to prevent Mr. Aczel from freeing himself, I pushed Mr. Aczel's upper body down several times. Mr. Aczel smelled of alcohol and continued to struggle with us. Officer Murphy (#446) then arrived and the three of us were able to handcuff Mr. Aczel by successfully holding both of this arms behind his back and the three of us held him still.

Mr. Aczel was then placed into Officer LaBonia's cruiser, but not without struggling with us while doing so. Officer Murphy then pulled Mr. Aczel into the back of the cruiser while Officer LaBonia and I pushed him into the back of the cruiser.

Because Mr. Aczel had been sprayed with a chemical agent, and he complained of labored breathing, Officer Murphy called for an ambulance to meet Mr. Aczel at Headquarters.

Officer LaBonia and Officer Murphy transported Mr. Aczel to Headquarters and I stayed on the scene to take statements from the two female residents of 42 Highland Avenue.

8/10/99 - STATEMENT OF VERONICA DEROSA - 3/10/72 - 744-6512

This afternoon, I went downstairs to the rear of the Goulash Place restaurant to do my laundry. I live in the upstairs apartment of the building where the Goulash Place is and it is a common practice to use the laundry facilities downstairs. I asked the owner John Aczel to open the basement area so that I could use the dryer.

Mr. Aczel screamed "Get the fuck out of my _____ !!", "I ain't opening shit for you." I asked John why he was yelling at me, and John went back into the restaurant.

I then called the police to settle the dispute over the dryer/laundry. At the time that the police arrived, Mr. Aczel was in the rear parking lot yelling and screaming at Gretchen Olsen and myself. When the officer arrived, he spoke to Mr. Aczel and then to us. Mr. Aczel continued to come towards us yelling, screaming and swearing. With concern for our safety and his the officer had Mr. Aczel sit in the police car. Once in the police car

page 2

Mr. Aczel continued to yell and scream and began to bang his head against the glass and kicking in (?) the car. The officer opened the door in an attempt to calm Mr. Aczel down, but he would not and resisted the officer. The officer had Mr. Aczel get out of the car but Mr. Aczel struggled and fought with the officer. More police officers arrived and handcuffed and arrested Mr. Aczel.

I watched all of this take place from the rear parking lot of the Goulash Place Restaurant, and from my apartment window which overlooks the parking lot.

Officer Moble assisted me with writing this statement.