**No. 00-93 (2nd Cir. 06/13/2003) Stephenson v. Doe**

Federal Appellate District: 2nd

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Argued: January 6, 2003 Decided: June 13, 200

Docket No. 00-93, 00-95

JAMAL STEPHENSON, Plaintiff-Appellant-Cross-Appellee,
v.
JOHN DOE, Detective, New York City Police Department, JOHN DOE, Detective, New York City Police Department, LEE BROWN, Commissioner, New York City Police Department, CITY OF NEW YORK, New York, New York individually and in their official capacities & NEW YORK CITY POLICE DEPARTMENT, Defendants-Appellees, and THOMAS DINGLER, P.O., Defendant-Appellee-Cross-Appellant.

Before: FEINBERG, F.I. PARKER and STRAUB, Circuit Judges.

Appeal from judgment of the United States District Court for the Eastern District of New York (Block, J.) dismissing a claim of excessive force after jury trial. Appellant argues that the district court erred in charging qualified immunity to the jury because the defense was waived and was barred as a matter of law. We vacate and remand for a new trial.

ALEXANDRA A.E. SHAPIRO (Noreen Kelly-Najah; Jennifer Herring, of counsel), Latham & Watkins, New York, NY, for Plaintiff-Appellant-Cross-Appellee. ELIZABETH S. NATRELLA, New York, NY (Michael A. Cardozo, Corporation Counsel of the City of New York; Pamela Seider Dolgow, of counsel), for Defendant-Appellee-Cross Appellant.

FEINBERG, Circuit Judge:

   Plaintiff Jamal Stephenson appeals from a judgment of the United States District Court for the Eastern District of New York (Frederic Block, J.) for defendant Thomas Dingler, based on a jury's finding of qualified immunity after a seven-day trial.1 The complaint, brought under 42 U.S.C. § 1983, alleged that police officer Dingler used excessive force when he shot Stephenson in the back during the course of an arrest, in violation of the Fourth Amendment. Plaintiff, who is partially paralyzed as a result of the shooting, sought compensatory and punitive damages. The jury found that Dingler had used excessive force against Stephenson but was nevertheless entitled to qualified immunity. On appeal, Stephenson argues that the district court erred in submitting the qualified immunity issue to the jury because the defense was waived and was barred as a matter of law. For reasons set forth below, we vacate the judgment and remand for a new trial.

   I. Background

   A. Procedural History and First Trial

   Stephenson brought his action in April 1996. His amended complaint alleged claims against officers Dingler and Thomas Collins and the City of New York. Defendants filed an answer generally denying Stephenson's claims. In various pretrial submissions, including the parties' joint pre-trial order, defendants also asserted the defense of qualified immunity on behalf of Dingler and Collins. They also

argued qualified immunity in their trial memorandum of law, and in their proposed jury instructions requested that the court decide the merits of the defense.

The case was tried before a jury in December 1999. By the close of evidence, Stephenson had withdrawn his claims against Collins and the City, leaving only an excessive force claim against Dingler. The qualified immunity issue was neither argued nor submitted to the jury, apparently on the understanding that the district court would decide the issue if there was a verdict for plaintiff.2 The district court did not reach the issue because the jury deadlocked on the underlying claim of excessive force, and the court declared a mistrial. Before setting the case for retrial, the court told defense counsel that while the court "can't prevent" a pretrial motion for qualified immunity, its "inclination would be to deny it [because] . . . there are these factual issues that have to be dealt with." The second trial commenced on January 31, 2000.

B. Evidence at Second Trial

At around 10:00 p.m. on May 19, 1993, Dingler shot Stephenson during a foot chase near a housing project in Brownsville, New York. The police had a warrant for Stephenson's arrest based on a 1991 indictment for murder in the second degree and weapons possession.3 On that evening, Dingler and five other NYPD officers in plain clothes set out to look for Stephenson. They had received a call from a security officer for the Brownsville project where Stephenson's family lived reporting that Stephenson had been in the area with a gun "in his belt, in his waistline."

After canvassing the area in an unmarked car and van for some time, the officers spotted Stephenson near a car talking to a young woman. Stephenson began to run as Dingler and Collins left the car to approach him. The two, joined by officer Alan Bernagozzi, chased Stephenson on foot while Steven Ward and two other officers pursued in the van. Stephenson ran into a nearby park and scaled a 10-foot high chain link fence separating the park from a basketball court. Dingler fired one shot through an opening in the fence. The bullet entered Stephenson's back and lodged in his spine, leaving him with permanent partial paralysis and loss of his bladder and sexual functions.

The parties' accounts diverge on a number of key issues, particularly whether Stephenson was armed. Stephenson testified that he was unarmed and running toward the basketball court, away from Dingler, when he was shot. Dingler testified that while he did not see a gun when he first approached Stephenson, he found it suspicious that Stephenson was wearing a jacket on a hot night. According to Dingler, Stephenson stopped running after landing on the other side of the fence and turned back toward him. Dingler testified that he saw a "shiny silver object" in Stephenson's hand that he believed was a gun and fired one shot because he "believed deadly force was going to be used against [him]."4 Dr. Martin Fackler, a ballistic wound expert for the defense, opined that Dingler's testimony was compatible with the fact that Stephenson was facing "basically straight ahead" when the bullet struck him from behind. Dr. Fackler suggested that Stephenson may have moved his body in the second it took for Dingler to recognize the alleged threat and shoot.

The defense also claimed that the object Dingler allegedly saw turned out to be an eight and a half inch steak knife rather than a gun. Bernagozzi, the first officer to reach Stephenson after the shooting, testified that he found the knife nearby, picked it up and handed it to Ward. Ward testified that he kept the knife in his pocket to secure it from a growing crowd and "vouchered" it at the precinct a few hours later. Stephenson's counsel argued to the jury that the knife had been planted by the officers involved in the chase. Charles Haase, plaintiff's expert on police procedures, testified that the knife was improperly safeguarded as it was not tested for fingerprints or photographed by the crime scene analysts who arrived later. Over defense counsel's objection, Haase also offered an opinion that police records of that night, apparently indicating that police officers called to the scene were available for assignment soon

after the shooting, were inconsistent with the defense's claim that irregularities in the handling of the knife were due, in large part, to crowd control problems.

In addition, the parties disputed whether the officers chasing Stephenson gave him adequate warnings during the chase and before the shooting. Dingler testified to shouting "police, stop" during the chase when Stephenson was about 25 feet away, which other officers testified to hearing. However, Dingler could not remember whether he gave any warning just before he shot Stephenson. Officer Collins testified that he did not hear Dingler give a warning before the shooting. Stephenson maintained that he ran off because he saw guns and did not hear any warnings.

C. Precharge Conferences and Rule 50 Motion

The arguments and evidence presented to the jury at the second trial dealt entirely with liability on the excessive force claim. But numerous precharge conferences were focused on questions of (1) whether, and on what basis, qualified immunity was available if the jury disbelieved Dingler's self-defense theory, and (2) whether qualified immunity should be charged to the jury.

On the district court's initial inquiry, defense counsel clarified his intent to raise the qualified immunity issue on a Fed. R. Civ. P. 50 motion. He argued that if the police had probable cause to believe (as they did here) that a fleeing suspect had committed second-degree murder, the law did not clearly prohibit the use of deadly force to prevent the suspect's escape even when there was no immediate threat of harm to anyone.5 Defense counsel also argued that qualified immunity encompasses reasonable subjective beliefs of immediate harm, even if mistaken. Plaintiff's trial counsel objected to any qualified immunity charge, stating: "I don't think that it is relevant. I don't think there's a stitch of evidence presented before you during this trial or the last trial to support this charge."

The district court left open the possibility that the qualified immunity defense was available, but expressed concern about submitting both the excessive force issue and the qualified immunity issue simultaneously to the jury. The court anticipated that the jury would get "totally confused here if I give an excessive force charge and say, in any event, you consider qualified immunity." The court also questioned whether a qualified immunity charge would say the "same thing the jury should be told in determining whether or not the force was excessive," and thus whether there was anything "left for [the jury] to determine under the concept of qualified immunity" if it found excessive force.

The district court instead suggested submitting "specific pointed questions" to the jury. The court indicated that, depending on the jury's answers to the interrogatories, he might have to "decide whether the law was clearly established and whether qualified immunity would attach." The court explained that these were questions for the court, but that the jury must resolve "disputed issues of fact that bear upon the question." Defense counsel agreed to this procedure and, at the judge's request, prepared special interrogatories.6 Defense counsel specifically requested that "the interrogatories not be submitted to the jury, until and unless the jury actually renders a verdict against the defendant on the basic charge of excessive force." (Emphasis in original). The court later clarified the procedure it would follow: "If [the jurors] come back and say that excessive force, under the charge as I propound it, has been employed, then I will go and ask them some specific questions, so we'll have a complete record here, so that some higher authority can decide what the exact status of the law is today as to when deadly force can be used . . . ."

At the end of plaintiff's case, defense counsel made an oral Rule 50 motion for judgment as a matter of law on liability and qualified immunity. The court denied the motion because there were factual disputes that might affect both issues for the jury to decide, namely whether the officers gave warnings

and, if so, the sufficiency thereof, and the credibility and reasonableness of Dingler's fear of danger. The district court and defense counsel engaged in lengthy discussion about the contours of clearly established law of deadly force. The district court again reserved decision on that question.

D. Jury Instructions and Verdict

The district court instructed the jury on excessive force first in general terms, as a determination of "whether the amount of force used when Dingler fired his weapon was that which a reasonable officer would have employed in effecting the arrest under similar circumstances." Describing the various factors the jury could consider, the court explained that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." The court then specifically instructed on the use of deadly force, "track[ing] the precise language of Tennessee v. Garner," 471 U.S. 1 (1985), as defense counsel requested:

. . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. However, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force, provided that, where feasible, some warning has been given. In that respect you may once again consider the existence, nature and duration of the arrest warrant, all of the plaintiff's actions from the first moment he observed the police, and all other relevant facts known by and confronting officer Dingler on the scene before the plaintiff was shot, in determining whether it would have been "objectively reasonable" for a reasonable police officer to have acted as Dingler did under the actual circumstances you find them to be.

Almost immediately thereafter, the district court informed the jury that "[e]ven if you find that defendant did subject plaintiff to excessive force, he still may not be liable to plaintiff . . . because the defendant may be entitled to what is called 'qualified immunity'" if he proved he neither knew nor should have known that his actions were contrary to federal law as I have just explained it to you and if a competent fellow police officer could not have been expected at the time to know that the conduct violated federal law. (Emphasis in original)

The judge also gave the jury a copy of the written charge and a special verdict form containing three general questions for the jury to answer. During its deliberations, the jury requested "a better definition of 'qualified immunity.'" Over plaintiff's objection, the district court attempted a clarification:

Now, I have told you what the clearly-established law is, when I explained to you the elements of excessive force. . . .

Then you have to look at the conduct of the officer here and all of the surrounding circumstances, and you then have to ask yourself the question: Given this law that I have told you is clearly established for your consideration, was it objectively reasonable for Officer Dingler to believe that his actions were lawful, were in accordance with that law at the time in question?

Plaintiff's counsel renewed his objection and defense counsel admitted to being "confused about how the charge went," because the instruction seemed to be "muddling objective reasonableness into the qualified immunity."

The jury returned its verdict the following day. The jury answered "Yes" to the first two general questions on the special verdict form:7 (1) Has Jamal Stephenson proved by a preponderance of the

evidence that Thomas Dingler used excessive force?; and (2) Has Thomas Dingler proved by a preponderance of the evidence that he is entitled to qualified immunity? Thereafter, the court entered a judgment of no recovery for Stephenson and dismissed the complaint in its entirety. This appeal followed.8

II. Discussion

On appeal, plaintiff Stephenson argues that the decision to permit the jury to decide qualified immunity was error, because (1) Dingler waived the defense by failing to adequately plead it and pursue it on a summary judgment motion, and (2) because the defense was barred as a matter of law and inconsistent with the jury's verdict on excessive force. Dingler responds that Stephenson's arguments were not preserved and that the jury's findings can be consistently construed.

A. Waiver

Before we deal with Stephenson's arguments why the jury verdict for Dingler on the issue of qualified immunity should be set aside, we must consider Dingler's claim that Stephenson cannot now raise his objections to the qualified immunity defense because he did not adequately press them in the district court. Although Stephenson objected to submitting qualified immunity to the jury on the ground that the defense was not relevant and had no evidentiary support, he did not seek judgment as a matter of law on the qualified immunity issue under Rule 50 or a new trial under Rule 59. It is well established that a reviewing court usually "does not consider an issue not passed upon below." Provost v. City of Newburgh, 262 F.3d 146, 161 (2d Cir. 2001). However, we recognize an exception to this rule, and may grant judgment as a matter of law where no Rule 50 motion was made, if necessary to prevent "manifest injustice." See Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998). We believe, under the confusing circumstances in this case, that enforcing the jury's verdict on qualified immunity may unjustly deprive Stephenson of the right to recover for a violation of his constitutional rights. In addition, this Court has the authority to review claimed inconsistencies in the verdict made after the jury is discharged, despite the failure to request a new trial. See Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp., 975 F.2d 48, 55 (2d Cir. 1992); see also Finnegan v. Fountain, 915 F.2d 817, 820 (2d Cir. 1990).

We therefore turn to Stephenson's claim that Dingler waived his qualified immunity defense because he did not adequately plead it and pursue it by a summary judgment motion in the district court before trial. Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). It is "more than a simple defense--it is an entitlement not to stand trial or face the burdens of litigation." Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002) (internal quotation marks omitted). A defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury. See Blisset v. Coughlin, 66 F.3d 531, 538 (2d Cir. 1995). We have explained that the defense can be waived "either by failure to raise it in a timely fashion or by failure to raise it with sufficient particularity." McCardle, 131 F.3d at 51 (citations omitted).

After reviewing the record, we conclude that Dingler did not waive his qualified immunity defense. Although defendants did not plead qualified immunity in their answer, they asserted the defense in other pretrial submissions, including the parties' joint pretrial order,9 defendants' trial memorandum of law and proposed jury instructions. Cf. McCardle, 131 F.3d at 51. In numerous colloquies with the court, moreover, Dingler clearly stated an intent to, and did, pursue a qualified immunity defense through a

Rule 50 motion. Counsel made specific arguments for qualified immunity, including that the law was unclear as to the use of deadly force to prevent the escape of a murder suspect against whom an arrest warrant had been issued.10 Cf. Blisset, 66 F.3d at 539 ("Appellants never articulated a qualified immunity defense distinct from their contention--the heart of their defense throughout these proceedings--that no constitutional violation occurred."). In addition, Dingler's failure to seek summary judgment on qualified immunity does not, on this record, amount to a waiver of the defense. Although the qualified immunity issue should be resolved "at the earliest possible stage in litigation," Saucier v. Katz, 533 U.S. 194, 201 (2001), summary judgment is not appropriate when there are material factual disputes. See Blisset, 66 F.3d at 538 ("Where summary judgment is inappropriate, . . . the defense of qualified immunity may be presented to the jury or may be decided by the court in a motion for judgment as a matter of law."); see also Saucier, 533 U.S. at 216 (Ginsburg, J. concurring) (summary judgment not permitted when the case "turns on which of two conflicting stories best captures what happened on the street"). Here, as the district court repeatedly stated, in order to reach Dingler's claim of qualified immunity the jury had to resolve various factual disputes in his favor.

B. Merits

1. Should the qualified immunity verdict be set aside?

We turn to the merits of Stephenson's claim that the district court erred in submitting the qualified immunity issue to the jury because it is barred as a matter of law. Stephenson argues that the qualified immunity verdict is inconsistent with the excessive force verdict, because the law was clearly established under the facts that the jury had to find in order to return a verdict against Dingler on excessive force.

As a general matter, police officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001) (quoting Harlow, 457 U.S. at 818). It is well established that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier v. Katz, 533 U.S. 194, 201-02 (2001) (citing Graham v. Connor, 490 U.S. 386 (1989)). However, identifying the generalized constitutional protection is not enough; the law must be "clearly established in a more particularized sense," Kerman, 261 F.3d at 236, that is, "in the specific context of the case." Saucier, 533 U.S. at 201. The Supreme Court has recently made clear that even officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection "from the sometimes hazy border between excessive and acceptable force."11 Id. at 206 (internal citation omitted). The relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202; see Loria, 306 F.3d at 1286 ("Said differently, . . . we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions."); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining that "the salient question" is whether the state of the law at the time of the violation gave officers "fair warning"). Thus, as the Supreme Court has pointed out, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Saucier, 533 U.S. at 202 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In this case, despite apparent agreement during the proceedings that the qualified immunity issue would be decided by the court if the jury found excessive force through the use of special interrogatories, the judge submitted both issues to the jury in his charge. But there was no basis by which the jury could assess whether qualified immunity attached to Dingler's use of excessive force. The jury was not presented with any evidence or instructions or even argument about possible ambiguities in the law with respect to the circumstances in this case or about Dingler's state of knowledge about the

law, presumably because the parties believed that the court would submit specific interrogatories and decide qualified immunity itself as it had indicated that it would. See Harlow, 457 U.S. at 818-19 ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained."). Rather, the jury was repeatedly told that the excessive force instruction represented "clearly established law." On excessive force, the court specifically instructed the jury that the use of deadly force to effect arrest was unlawful unless an officer had probable cause to believe, in light of all the facts known by and confronting him, that the suspect posed a serious physical threat to him or to others and sufficient warnings were given. The court later emphasized that this law was clearly established for purposes of qualified immunity. Under those instructions, the jury returned a verdict of liability on excessive force, apparently crediting Stephenson's account that he was not given adequate warning and was unarmed and fleeing when he was shot and rejecting Dingler's testimony that he believed Stephenson was armed and that his own life was in danger. Yet under the same "clearly established law," the jury nevertheless found that Dingler was also entitled to qualified immunity.

Conceding at least an apparent inconsistency, Dingler argues that the excessive force and qualified immunity inquiries are distinct, and that this Court should reconcile the jury's findings based on the record. According to Dingler, the jury may have believed that Stephenson did not objectively pose a threat of harm to Dingler but that Dingler's subjective belief of threatened harm was a mistake of fact that, in view of the evidence, the jury credited as reasonable. We are mindful that seemingly inconsistent verdicts should be reconciled if possible. See Tolbert v. Queens College, 242 F.3d 58, 74-75 (2d Cir. 2001); Finnegan, 915 F.2d at 820. However, we must decline Dingler's invitation to reweigh the evidence in his favor.

Moreover, as the Supreme Court clarified in Saucier, claims that an officer made a reasonable mistake of fact that justified the use of force go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity.12 See Saucier, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."); see also id. at 206 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."). The qualified immunity inquiry, by contrast, concerns an "officer's mistake as to what the law requires" and acknowledges that "reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 205 (emphasis added); Kerman, 261 F.3d at 239. Accordingly, we conclude that the qualified immunity verdict is legally inconsistent with the verdict on excessive force and should not stand.

2. Fairness of allowing the excessive force verdict to stand

The question then arises whether the excessive force portion of the jury's verdict should stand even though we have concluded that the qualified immunity verdict cannot. Dingler argues that the excessive force verdict must also be set aside because "egregious trial error" by the judge in conducting the trial tainted the jury's finding of excessive force and thus denied Dingler the right to a fair trial.13 Stephenson denies any unfairness in the trial and urges us to allow the jury's finding on excessive force to stand. Alternatively, Stephenson asks that we remand for a new trial if we find that the confusing circumstances regarding the qualified immunity instruction undermine our confidence in the excessive force verdict. We conclude that under all the circumstances in this case a new trial is warranted.

We have said that "the proper approach when faced with seemingly inconsistent verdicts is not to

credit one finding and vacate the other." Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 598 (2d Cir. 2001). If we are "unable to harmonize the jury's findings, 'we must vacate the judgment and order a new trial.'" Id.; see also Tolbert, 242 F.3d at 74. Moreover, we conclude from the record before us that the risk is simply too great that the instruction on qualified immunity improperly affected the jury's consideration of whether Dingler used unlawful force.

It appears to us, particularly given the absence of evidence, instruction or argument submitted to the jury on the qualified immunity issue, that the instructions on excessive force and qualified immunity conveyed the same concept for both so that the jury in effect was told to decide twice what an objectively reasonable police officer would do in the situation that Dingler faced. To decide the qualified immunity issue, the jury was told to "look at the conduct of the officer here and all of the surrounding circumstances" and determine whether it was "objectively reasonable for Officer Dingler to believe that his actions were lawful." This bears a close resemblance to portions of the excessive force charge, where the jury was asked in part to consider "all other facts known by and confronting officer Dingler on the scene before the plaintiff was shot, in determining whether it would have been 'objectively reasonable' for a reasonable police officer to have acted as Dingler did under the actual circumstances you find them to be." Indeed, even defense counsel admitted to being confused about the difference. In addition, even though the judge had asked for, and obtained from Dingler,14 specific interrogatories that would have made clear the jury's findings on various disputed issues of fact, the judge did not submit them to the jury.

Moreover, as the district court anticipated, there is a high likelihood of confusion when the jury is given an excessive force charge and instructed, "in any event, you consider qualified immunity."15 The jury was, in effect, told that it could find that Dingler used excessive force but could then still let him off the hook by finding qualified immunity. On this record, there is a risk that the effect of having such an "out" (by finding qualified immunity) affected the care with which the jury conducted the excessive force inquiry. See Atkins v. New York City, 143 F.3d 100, 104 (2d Cir. 1998) (ordering new trial on all issues because of possible "compromise verdict" where liability was "closely and vigorously contested"). If that is what happened, it would not be fair to throw out one part of the verdict (qualified immunity) but let the other (excessive force) stand. See Finnegan v. Fountain, 915 F.2d 817, 821 (2d Cir. 1990) (ordering new trial because of irreconcilable verdict, and explaining that even if the jury should not have been allowed to make the latter finding "this does not inspire any more confidence in the former [finding]").16

Finally, we note that the stakes are extremely high for both parties in this case. We are told that this incident was Dingler's only shooting in his almost twenty-year police career and that it resulted in permanent partial paralysis for Stephenson. In addition, both parties ask for a complete new trial as alternative relief, if we do not accept their principal arguments. Accordingly, under all the circumstances we reluctantly remand this case for a new trial despite the burden this places on the parties and the court.

3. Procedure in new trial

While ordinarily the qualified immunity issue should be resolved, as the Supreme Court has emphasized, early in the proceedings, there are material issues of fact set forth below that preclude summary judgment on that basis. See Curry v. City of Syracuse, 316 F.3d 324 (2d Cir. 2003). On remand, the district court should substantially follow the procedure it outlined, and the parties agreed to, during precharge conferences. The court should charge the jury on excessive force, but not on qualified immunity. If the jury returns a verdict of excessive force against Dingler, the court should then decide the issue of qualified immunity.17 We have said that the ultimate legal determination of whether qualified immunity attaches to a law enforcement agent's actions is "a question of law better left for the court to decide." Warren, 906 F.2d at 76. We have recognized that qualified immunity

is in essence a legal decision whether on the basis of the law as it existed at the time of the particular incident, the lawfulness of the officer's conduct was reasonably clear or was a matter of doubt. Juries are hardly suited to make decisions that require an analysis of legal concepts and an understanding of the inevitable variability in the application of highly generalized legal principles. Moreover, such an analysis would seem to invite each jury to speculate on the predictability of its own verdict.

Finnegan, 915 F.2d at 821 (quoting Warren, 906 F.2d at 77) (Winter, J., dissenting on other grounds).

We realize, however, that there may be factual disputes overlapping the excessive force and qualified immunity issues that the jury must find.18 Cf. Oliveira, 23 F.3d at 650 (remanding for trial on the sole issue of qualified immunity because "[factual] disputes bear directly upon whether it was objectively reasonable for the officers to believe that they were acting lawfully"). We believe that use of special interrogatories in this case resolves the difficulty of requiring the jury to decide "what the facts were that the officer faced or perceived" and requiring the court to make the ultimate legal determination of whether qualified immunity attaches on those facts.19 Warren, 906 F.2d at 77.

Therefore, if there is a retrial and if Dingler asserts a qualified immunity defense that depends on disputed factual issues, it will be helpful to focus the jury's attention both in the charge and by use of a few pointed interrogatories on the key factual disputes that may affect the resolution of the qualified immunity issue, such as whether Dingler gave warnings to Stephenson, whether Stephenson was armed with a weapon, and whether Dingler actually believed Stephenson was armed.20 For the foregoing reasons, we vacate the judgment and remand for proceedings consistent with this opinion.

---

Footnotes

1 This was the second trial. As will be seen below, the first trial ended in a mistrial after the jury deadlocked.

2 The district court also raised the possibility that Dingler had waived the defense. Dingler's counsel, however, reminded the judge that he "specifically stated on the record that our Rule 50 [motion for judgment as a matter of law] was reserved for after [the verdict]."

3 The warrant was based on Stephenson's alleged involvement in a 1991 shooting by his brother, who already had been convicted. The jury in this case was informed that Stephenson was later tried and convicted of second-degree murder for his role in the crime, and is currently serving a sentence of 15 years to life in prison.

4 Dingler's testimony about seeing a "shiny silver object" was given at his internal police hearing and was read into the record at trial.

5 The apparent basis for this argument was that the nature of the crime charged in the warrant was a special circumstance to be considered on the issue of qualified immunity.

6 It appears that plaintiff submitted interrogatories at the first trial. We are not sure from the record before us whether plaintiff did so at the second trial.

7 The jury did not reach the third question, which went to the amount of damages.

8 Stephenson appealed pro se, but new counsel was appointed by this Court in May 2002. Dingler filed a crossappeal, but withdrew it by stipulation after Stephenson's appellate counsel moved to dismiss the cross-appeal as untimely and jurisdictionally barred.

9 The joint pre-trial order was issued before the first trial. Defendant credibly argues that the pre-trial order remained effective for the second trial, which commenced about six weeks after the end of the first trial.

10 Defense counsel also argued that Dingler acted under a reasonably mistaken belief that he was in danger, an argument discussed below.

11 The "reasonableness" standard for determining whether an officer's use of force is excessive already "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-397.

12 The jury was not specifically instructed to consider reasonable mistakes of fact as part of the excessive force inquiry.

13 For example, Dingler claimed that the court was blatantly hostile in its questioning of his expert witness. As will be seen below, we see no need to deal with this argument.

14 See supra note 5 and accompanying text.

15 Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct. This inherently makes for confusion. See Oliveira v. Mayer, 23 F.3d 642, 648-50 (2d Cir. 1994); see also Boyce v. Fernandez, 77 F.3d 946, 948 (7th Cir. 1996).

16 We do not suggest that allowing a jury to decide both the excessive force and the qualified immunity issues will always throw doubt on the validity of the jury's verdict. But on this record, we believe that it does, for the reasons given above. It is at least questionable, however, whether as a general matter in the context of an excessive force claim a jury should decide the ultimate issue of qualified immunity, in addition to the factual disputes that may bear on the issue. It seems to us that a jury would have a difficult time making that legal determination, especially without an evidentiary hearing on the state of the law at the time of the alleged violation. See discussion accompanying note 18 infra.

17 The court may have to decide whether, at the time of the shooting, the state of the law regarding the use of deadly force was unclear under the circumstances that the jury finds, so that Dingler is entitled to qualified immunity. For example, if the jury finds that Dingler gave reasonable warnings, the court may have to decide whether the law was unclear as to the use of deadly force to prevent the escape of a murder suspect. See supra note 5 and accompanying text.

18 Courts have disagreed about whether a jury that is provided a proper legal basis should decide qualified immunity. See Curley v. Klem, 298 F.3d 271, 278-79 & n.3 (3d Cir. 2002) (discussing various approaches). The Supreme Court might have been faced with this question in a case similar to the one before us, see Snyder v. Trepagnier, 142 F.3d 791 (5th Cir. 1998), cert. granted, 525 U.S. 1098 (1999), in which the questions on which certiorari was granted were formulated by the Court as follows: "1. Whether a jury finding that a constitutional violation incurred by use of excessive force in an arrest

necessarily precludes a finding of qualified immunity, so as to make such dual findings irreconcilable? 2. Whether a reviewing court may reconcile apparent inconsistencies in special jury verdicts despite possible defects in special interrogatories submitted, by determining whether, upon review of the entire record, the verdict as a whole was reasonable and supported by the evidence." However, the appeal was dismissed after the parties settled the case. See 526 U.S. 1083 (1999). See generally Leon Friedman, Qualified Immunity When Facts Are in Dispute, 16 Touro L. Rev. 857, 862-65 (2000).

19 We recognize that the use of interrogatories is a matter for the judge's discretion. See, e.g., Romano v. Howarth, 998 F.2d 101, 104 (2d Cir. 1993). But we believe that using interrogatories here would be wise in view of the circumstances of this case.

20 We leave it to the court and the parties to fashion the specific language of the interrogatories.

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.