## THE UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

*******************************************
                       *

JOHN ACZEL            *
  Plaintiff,             *
                       *

vs.                 *   CIVIL ACTION NO. 3:00-CV-01802(PCD)
                       *
              *

                       *

LEONARD LABONIA, ET AL  *
  Defendants.        *   JANUARY 10, 2006
*******************************************

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO RENEWED MOTION FOR JUDGMENT

**FACTS:**

      This case was tried to a jury in the course of 3 days, on December 7, 8, and 12. On

December 13, 2005, the jury retired to consider its verdict. On December 14, 2005, the jury

returned a verdict finding for the defendants on all counts except for the count alleging a

violation of the plaintiff's constitutional rights by the use of excessive force by Leonard Labonia.

On that count, as is evidenced by the answers to interrogatories to the jury, the jury found that

excessive force had been used, that the plaintiff was entitled to damages in the amount of

$12,078.61, and that the defense of qualified immunity applied. This Court, recognizing the inconsistency of the finding, sent the jury back for further consideration. The jury returned and indicated that it could not reach a verdict on the excessive force count because the verdict was a "compromise." The jury asked whether they could award damages and also find that qualified immunity applied. The Court informed the jury that they could not do both. The Court then sent the jury back again to consider further its verdict. The jury subsequently returned indicating that it could not reach a unanimous decision on the excessive force count but would like the opportunity to change its verdict on the other counts. The Court having already accepted the verdict for the defendants on the other counts indicated that the jury could not do so. Eventually the jury returned and indicated that it could come to no other conclusions than it had. The jury indicated that they had debated the issue for two days and the compromised and inconsistent verdict was the only verdict on which they could agree.

The plaintiff moved for a mistrial, and the Court reserved its decision on the motion for a mistrial. The Court indicated that the defendant could file a Rule 50 motion for a judgment as a matter of law and was given two weeks to file a memorandum. The plaintiff was given two weeks to file a memorandum in response to the defendants' motion.

By pleading dated December 22, 2005, the plaintiff filed a Motion for a New Trial on all counts on the basis that the jury clearly and impermissibly reached a compromise verdict and the verdict was internally inconsistent.

## I.    TESTIMONY OF JOHN ACZEL AT TRIAL

The evidence at trial solicited from Plaintiff is as follows:

Plaintiff, John Aczel (hereinafter "Aczel") owned and operated a restaurant located at the scene of the incident. The restaurant operated by Aczel serves lunch and diner.  Aczel opens the restaurant doors at 11:30 a.m. to serve lunch.   The restaurant closes at approximately 10:00 p.m.  In 1999, Aczel and his wife were the only employees of the restaurant.  Gretchen Olsen (hereinafter, "Olsen"), a tenant of Aczel,  was  living on a second floor of the premises attached to the restaurant.   Gretchen Olsen's roommate Veronica DeRosa Stefano (hereinafter "DeRosa") lived with her.

As part of an agreement between Aczel and his tenant Olsen, Olsen had the right to use a clothes dryer in the basement of home but <u>not</u> during the restaurant's dinner time.   It was agreed that the washer/dryer room would be locked during dinner time and would not be used during dinner time.

Page 3 of  30

August 10, 1999 lunch was served at the restaurant. After lunch, Aczel began his food preparations for the dinner crowd.

On August 10, 1999, the door to the washer/dryer was locked at 4:00 p.m. After Aczel locked the door, DeRosa asked Aczel to unlock the door to the room containing the washer/dryer. Aczel refused to unlock the door because it was dinner time at the restaurant. Upon being denied access to the clothes dryer, DeRosa began screaming and yelling profanities at Aczel. DeRosa told Aczel she was going to call the police.

When the police arrived, Aczel's restaurant was open. Aczel was preparing food for the dinner crowd. Specifically, he was setting up the salad bar. Daily, Aczel begins the cooking preparations for the dinner crowd at approx 4:00 p.m.

Aczel testified that the police appeared at his property at 4:15 p.m- 4:30 p.m. He estimates the arrival time of the police based upon where he was in his 28 year routine of setting up the salad bar for the dinner crowd.

Aczel was in the kitchen of the restaurant and had just started to go outside to the cooler when he spotted the arrival of the police in the parking lot of the restaurant. At this time, Aczel did not know where DeRosa and Olsen were located.

As Aczel was exiting the restaurant, Labonia asked him whether he knew who called the police. Aczel responded that he did not call, but that, his tenant probably called. He then began to escort Labonia to the back of his house where the entrance to Olsen's apartment was located. However, as he turned the corner of his house he could see Olsen and DeRosa outside in the parking lot of the restaurant, toward the rear of the house. Aczel walked the police officer to where they were, and then turned to walk back towards the restaurant to continue his dinner preparations for the restaurant.

As Aczel was walking back toward the restaurant, Labonia came up to him, grabbed him from behind and escorted him into the police cruiser. Labonia did not tell Aczel that he was under arrest. However, Aczel was not free to leave. Aczel and witness David Fesh (hereinafter, "Fesh") testified that Aczel posed no resistance to Labonia's grabbing onto his arm/or shirt and escorting him into the cruiser. Based upon Aczel and Fesh's testimony, at no time prior to Labonia's placing Aczel in the cruiser and arresting him in the cruiser did Aczel exhibit any conduct which would constitute a crime.

When Aczel was placed in the rear of the cruiser, the doors to the cruiser were locked from the inside.  The cruiser was parked, the motor was off, and the windows were closed.

Labonia locked Aczel inside the car and left him unattended while he proceeded to interview the Olsen and DeRosa regarding the verbal dispute over the use of a clothes dryer.

The evidence showed that once Aczel was in the cruiser, Aczel started to feel the temperature in the car rising. He could not breathe, became sick and overheated. Aczel started banging the window of the police car and screaming "Help, Help", so that he could get the attention of Defendant, Officer Leonard Labonia (hereinafter, "Labonia") to help him and get him out of the car. DeRosa confirms that she heard Aczel say "AHHH, AHHH, AHHH. Aczel testified that to him he felt as if it was 99-100 degrees inside the car. He could not breathe. Whether he could not breathe because it was truly hot, or because he got nervous, or because he became panicked is irrelevant. The crux of the testimony is that Aczel could not breathe while in the cruiser.

Once Aczel was out of the cruiser, Labonia turned Aczel so that he was facing the car with his hands raised. Labonia then placed his right hand on Aczel's throat in a choking fashion, and said to Aczel "You're under arrest". Obediently, Aczel then placed his left arm behind his back and Labonia put Aczel's left hand in a handcuff. With his knee, Labonia then kicked Aczel in the ribs (on the left side of his body) and injured Aczel's ribs. After being kicked, Aczel started to fall down to the ground but the officer held him with the chain of the

handcuff (that he had placed on his left hand) and kicked Aczel again , one more time on the left side of Aczel's face (near the left eye area) and fractured Aczel's left zygomatic arch.   Aczel then fell to the ground.

Once on the ground, Aczel was crying for help.  David Fesh's testimony confirmed that Aczel was screaming in "pain" as he lay in a fetal position on the ground.

When on the ground,  Aczel was in a fetal position, with one arm trapped underneath his side, with Labonia on top of him holding Aczel's other arm in an arm hold.  Furthermore, one of Aczel's arm was handcuffed at this time.   However, despite having complete control over Aczel, Labonia, who was on top of Aczel,  pepper sprayed Aczel while Aczel was on the ground in this fetal position.  Aczel testified that he was pepper sprayed during the last second while he was on the ground and prior to being picked up and placed in the police cruiser for a second time.  Aczel testified that, at the time he was pepper spayed, at least one other officer was at the scene of the incident.  There was testimony that Defendant, Officer Ethan Mable (hereinafter, "Mable")  was the second officer to arrive at the scene of the incident.  Thus, Mable was at the scene of the incident when the pepper spraying took place.  As Labonia sprayed Aczel, he said to Aczel "Now [I][we] finish the job".  Labonia then picked Aczel up off the ground and placed him in the police car, and Mable did nothing to stop the further use of

excessive force by Labonia on Aczel.   In fact, Aczel testified that Mable participated in the attack. As Aczel lay on the ground, Mable, Labonia and other officers who arrived, kicked Aczel in the face, chest, arms and knees.  Aczel testified that he was in so much pain he could not move.

Although the police officers have attempted to put forth evidence that Aczel self-inflicted his injuries through DeRosa and Labonia who testified that Aczel was hitting his head against the window of the police cruiser, Aczel denied this and the evidence showed that the nature of the injuries also tell a different story.  For example, the black right eye and  the bruising and scratches on Aczel's body are inconsistent with Labonia's claim that these injuries were self-inflicted in the cruiser.

Officer Labonia's tale of the incident does not make sense because if Aczel truly  had broken his zygomatic bone, his left wrist and injured his ribs, and his jaw area in the back seat of the cruiser, then he would be in so much pain when Labonia opened the door to the cruiser that he could not possibly with all those broken bones now resist a 205 pound officer's effort to handcuff him. The testimony of Labonia at trial was self-contradictory.  The jury's verdict finding excessive force acknowledges that Labonia's testimony was not credible.

Page 8 of  30

When Aczel arrived at the police station there was an ambulance waiting for him. Aczel was accompanied by the police in the ambulance. Aczel could hear the officers talk to the ambulance attendants. During the ride to the hospital and during the first time he was at the hospital, Aczel was unable to talk due to a burning sensation in his chest and throat from the pepper spray. He had no voice. Aczel was unable to tell hospital personnel or ambulance attendants that any portion of his body was sore and hurt because he could not talk. Moreover, when at the hospital, Aczel was tied down in the stretcher and his hands were handcuffed on top of his stomach. He was at all times accompanied by a police officer. Aczel did hear the police officers talk to the hospital doctors as well as the ambulance personnel.

Aczel testified that he did not attempt to break free from Officer's Labonia's control, he did not use force , he did not flee, he did not threaten anyone on the date of the incident.

The evidence showed that the police attempted to conceal their use of excessive force on Aczel by declaring that Aczel was drunk on the date of the incident. Aczel testified, however, that, on the date of the incident, he was not under the influence of alcohol. On the day of the incident, Aczel drank one spritzer (which he described as a half glass of wine mixed with a half glass of club soda) at approx 2:00-2:30 p.m. that day. He consumed no other alcoholic drinks that entire day.

Page 9 of  30

The police officers attempt to justify the fracturing of bones in Aczel's body by attempting to prove that he was drunk, as if, they have some entitlement to beat up a person in a drunken condition. However the jury was entitled to use common sense to infer and/or conclude that an owner of a restaurant, who is preparing to cook dinner for patrons of the restaurant, a restaurant with a capacity to sit and feed 65 people at a time, would not be drunk during dinner time at the restaurant, when he would be required to begin taking dinner orders and making dinner for 65 people. The evidence showed that Aczel and his wife were the only employees at the restaurant. The jury, in this case, acknowledged that it believed Aczel was not drunk when it found that Labonia used excessive force.

Moreover, The hospital records document that Aczel was unable to be interviewed at the time of registration. He was unable to be interviewed because, he could not talk due both to the fact that the pepper spray irritated his vocal cords and due to the fact that he had jaw injuries so bad that he could not open his mouth. Even two days after the incident, on August 12, 1999, Aczel's treating physician documents that Aczel was "acutely incapacitated and in severe pain involving face, arms and legs, hobbling and barely able to speak because of facial swelling and difficulty opening mouth" In fact, the evidence showed that a review of the injuries in this case, is consistent with the medical notations in the doctor's report that Aczel was unable to open his mouth due to facial and jaw injuries and swelling.

Also, despite the fact that the police are claiming that alcohol was the reason for the seizure and arrest of Aczel, and despite the fact that the hospital records indicate that Aczel was

intoxicated, there were no tests performed on Aczel to confirm whether or not he was intoxicated. Mable testified that he could not state for certain whether Aczel was intoxicated. Labonia testified that he told the officers who accompanied Azel to the hospital that Aczel was drunk. At the hospital, Aczel tried to talk to the doctor but could not because he had no voice. Aczel overheard the police talk to the ambulance attendants and the doctors. On that day, Aczel was wearing T-shirt that was pepper sprayed and which had yellow spotted stains from the pepper spray. Aczel's hair was disheveled. Aczel could not fully open his mouth. Aczel could not talk because of the effects of the pepper spray on his vocal cords. Aczel had extreme pain to his head, arm, and body. He could not sit. He smelled of pepper spray. He lacked of coordination and could not walk when he was blinded by the pepper spray. A jury could reasonably infer that Aczel was not drunk but the ER attendants or hospital doctors who had seen Aczel in the condition that he was in may have mistakenly concluded that he was drunk rather than beaten up, especially when coached by the officers who escorted Aczel to the hospital. The evidence showed that those officers were told by Labonia that Aczel was drunk. Aczel testified that the officers repeated that information to the ambulance attendance and to the doctors at the hospital.

It is noteworthy that the hospital released Aczel to the custody of the police but they placed a disclaimer in their report, stating, to wit, that "it was stressed about the patient's head injury precautions". No X-rays were taken despite this acknowledgment of a head injury.

The evidence also showed that the police officers attempted to conceal their use of excessive force on Aczel by declaring that Aczel was accused of committing sexual assault in the fourth degree that day. This too is denied by Aczel. The evidence showed that there is no evidence to substantiate this accusation by Labonia. Aczel was not charged with having committed sexual assault in the fourth degree. Not even DeRosa who called the police on Aczel would agree to corroborate this fabrication by Labonia.

Olsen also did not corroborate Labonia's statement. She gave a witness statement to Mable, and Mable testified that her witness statement did not include any such complaint. It is reasonable for the jury to have concluded that this complaint of sexual assault was a failed attempt of Labonia to cover up the fact that he beat up Aczel. When Labonia could not get anyone to support this fabrication, he dropped it. Labonia did not testify on direct examination that such a complaint was made. It was only on cross-examination that this complaint was brought to jury's attention. It is reasonable for the jury to have concluded that Labonia did not bring this matter to the jury's attention because it is not true. It was merely another attempt of Labonia to cover up his wrongdoings on the date of the incident.

Although a doctor saw Aczel in the hospital, the doctor did not treat his injuries with respect to the injured ribs, fractured zygomatic arch and fractured wrist. There was no dispute by Defendants at trial that when Aczel was brought to the hospital for the first time that he had broken bones. No X-Rays were taken at the hospital when Aczel was brought there by the police. The doctor had conversations with the police officers who accompanied Aczel and then

discharged Aczel to the police.   Labonia told those officers that accompanied Aczel to the hospital,  that Aczel was drunk and it is reasonable to infer that those officers ran with this tale at the hospital.  Labona admitted to at least punching Aczel in the face, yet Aczel's jaw was not treated at the hospital when he was brought there by the police.

The evidence showed that after the visit to the hospital,  Aczel was then bought back to the police station, fingerprinted and photographed.  Aczel still had no voice when he arrived at the police station.   Sometime after he was processed at the police station, Aczel's voice returned.

Aczel was arrested at the police station for a couple of hours until he was released.  As he was leaving the police station,  he was informed for the very first time as to the charges for his arrest.

After Aczel left the police station, he was driven back to the hospital by Diane Fernandez.  Diane Fernandez is an objective witness in this case.  She testified that when she picked up Aczel from police station he was in bad shape and she and her husband had to help him walk to the car and get him in.  Diane Fernandez testified that Aczel looked like he was in pain.  She testified that he was not drunk.  She further testified that he cried in the back seat of her car. When she took Aczel to the hospital she had to put him in a wheel chair.   During Aczel's second visit to the hospital, X-Rays were taken which showed fractured bones on Aczel's face and wrist.

The evidence showed that the police officers used the criminal process against Aczel in order to intimidate him from asserting his rights against them and in order to cover up their own wrongdoing and avoid civil and criminal liability for their own acts. The evidence showed that Defendant police officers arrested Aczel and charged him with criminal offenses to conceal and excuse their attack on him. The evidence showed that Defendant police officers further attempted to conceal their attack on him by preparing a false police report, and, by falsely informing police escorts who accompanied Aczel to the hospital and who told medical personnel at Danbury Hospital that he was intoxicated, although Defendant police officers and the hospital did not seek to perform and did not perform any tests to confirm such claims.

The evidence showed that Plaintiff was incarcerated for four to five hours, was required to appear in Court as an accused criminal, and was required to spend money to hire an attorney to defend himself against the false charges. Additionally, Plaintiff claims that he suffered a loss of liberty, inconvenience and humiliation, physical pain and disability, and emotional distress. The medical records in evidence support that Plaintiff suffered the following injuries:

- a Fracture of the left zygomatic arch, with three separate fracture lines identified (Surgery was performed re: the depressed left zygomatic arch fracture)
-injury to three left ribs
-left kidney trauma
-a fracture of left wrist left wrist and soft tissue swelling of the left wrist
-a general head injury
-benign positional vertigo causing severe and persistent dizziness that was exacerbated by bending, looking up, turning over in bed
-abrasions and contusions, swelling and black and blue marks, to his face, right temple, right eye, cheek, left chin, both arms and both knees, and both elbows
- inability to open mouth fully due to fractures, swelling, etc.
-pain and clicking of his jaw when eating

- symptoms of bilateral TMJ pain upon opening
-due to physical injuries, the inability to work for a period of time.
-back and neck pain
-weakness of the muscles of the left eyebrow and upper lid (this weakness was
     secondary to inflamation in the area branches of the facial nerve)
-the eyelashes of Plaintiff's left eye drooped in front of eye, obscuring his vision
     unexpectedly
-humiliation

There was also evidence of the following permanent injuries:

-positional Vertigo-
-vision problems as a result of the left eyelid drooping in front of Aczel's visual
     field unexpectedly.
-intermittent pain and weakness in left wrist

## II.    TESTIMONY OF DAVID FESH,  AN OBJECTIVE WITNESS

The evidence showed that David Fesh, is an objective witness.  He testified that at, at the time of the incident, he lived directly across the street from the parking lot of Aczel's restaurant.  As the police car pulled into the parking lot, Fesh was standing outside in front of his front porch.

Fesh testified that he did not hear any loud noises or yelling prior to Aczel being placed in the cruiser the first time.  This testimony is contrary to the testimony of Labonia and DeRosa.

Fesh testified that after the police arrived and after Aczel was placed in the police car, the first time,  Labonia returned to the police car to let Aczel out of the car. Initially, Labonia physically turned Aczel around as he was standing outside the door of the police cruiser so that after he was turned, Aczel's back was facing the officer.  Aczel's hand was behind his back when it was handcuffed. Aczel was not moving at all during the process of being handcuffed.

Thereafter, Fesh testified that Aczel turned his head, and Labonia punched him in the head. Although Fesh did not see a kick to Aczel's face and ribs as testified to by Aczel, that does not mean it did not happen. The jury could have reasonably concluded that since, Fesh was facing Labonia's back, Labonia's back was an obstruction to his ability to see what was happening in front of Labonia. Fesh testified that from the time that Aczel got out of the car until the time that he was punched, his view was unobstructed by trees, etc., and he did not lose sight of Aczel and the officer.

Fesh testified that Labonia and Aczel ended up on the ground. Aczel was on the ground in a little looser than fetal position. Labonia was on top of Aczel. Fesh testified that he dragged Aczel toward the rear of the cruiser. As Aczel lay on the ground, one of Aczel's arms was pinned underneath him as Labonia lay on top of him. As Aczel was in a ball on the ground, Labonia, while on top of Aczel, pepper sprayed him. Fesh testified that Aczel was yelling in pain.

David Fesh testified that Aczel did not did not threaten, kick or strike Labonia in any way, with either his arms, feet, head or any part of his body. At no time, did Aczel attempt to get up and run.

After Aczel was placed in the cruiser the second time, Fesh was interviewed by another police officer. While being interviewed, Fesh told the officer that interviewed him, to wit, "that he [referring to Labonia] used too much force."

Fesh did not see the other four officers kick Aczel.   A simple explanation was given for this.   Fesh testified that when other officers came, he got out of way and went back to porch of his house across the street.  He had his back toward the parking lot as he crossed the street to his house.  Also when, and if he looked again toward the scene of incident, after he returned home, the police officer and Aczel at this time were behind cruiser and not on the driver's side of the cruiser as they had been earlier, therefore, his vision would have been obstructed by flowers, trees, and the elevation of the grass/ground.   It is reasonable for the jury to have concluded and/or inferred that Fesh could not possibly see the kicking on ground even if he was watching at that time.

### III. TESTIMONY OF LEONARD LABONIA AT TRIAL

Labonia testified that on the date of the incident he was physically fit and strong. Specifically, he weighted 205 pounds. In 1999, he was training on a regular basis, which included weight lifting and bench pressing anywhere from 230 to 245 pounds.  Labonia had a gun, handcuffs, mace, baton, flashlights on him.

Labonia makes an argument that defies common sense.  He claims that Aczel inflicted injuries on himself in the back seat of the cruiser by banging his head against the cruiser window or separation.  Labonia also claims that despite all those broken bones that Aczel inflicted on himself, this physical dynamo,  Labonia, could not subdue Aczel.  It was reasonable for the jury to disbelieve Labonia on this issue.

Labonia admits that, at one point, he was on his knees and Aczel's body was in between his thighs. Labonia even admits that at one point Aczel's arm was tucked underneath his chest, with this 205 pound Labonia on top of him. Having made those admissions, and having argued that Aczel, at this time, had already broken several of his own bones in the back seat of the cruiser, Labonia continues to argue that Aczel was resisting arrest and pepper sprayed Aczel. It was reasonable for the jury to conclude that Labonia is not credible on his claim that Aczel was resisting arrest and to conclude as it did, that excessive force was used.

Labonia contradicted his prior deposition testimony, the testimony of Aczel and the testimony of DeRosa when he testified that he pepper sprayed Aczel in his chest. At trial it was elicited that Labonia testified at his deposition that he pepper sprayed Aczel in the eye area. Mable testified that if a person is pepper sprayed in eye, a person can experience eye watery and tearing, a loss of vision, and a loss of balance and coordination. Mable testified that, he himself, was pepper spayed in the eyes during training and further testified that when he got pepper sprayed in the eyes, he could not walk.

DeRosa testified that Labonia aimed at Aczel's face when he pepper sprayed him. DeRosa testified that Labonia applied a continuous burst of pepper spray into Aczel's face. The policies of the police department caution against aiming pepper spray at an individual's eyes.

Significantly, Labonia admitted that Aczel was having problems seeing after he was pepper sprayed. Mable also admitted that Aczel was having breathing problems after he was pepper sprayed. At the time of the pepper spraying, the evidence showed that Aczel had

fractured bones and yet Officers Labonia and Mable argue that it took three officers to handcuff Aczel due to lack of cooperation by Aczel rather than due to the physical disabilities inflicted by the police officers on Aczel. It was reasonable for a jury to disbelieve Labonia and Mable on this issue. It was reasonable for a jury to infer that it took more than one officer to handcuff Aczel because Aczel was in such bad shape that he could not move or walk without assistance.

The evidence showed that although Labonia testified that Aczel was resisting arrest and attempting to physically attack him, and further testified that Aczel kicked him in the shins, Labonia did not receive any scratches, bruises, or injuries as a result of the incident on August 10, 1999. It was reasonable for the jury to conclude or infer that Labonia was not being truthful on this issue of Aczel resisting arrest.

Labonia testified that Aczel was kicking and pushing him when Mable arrived on the scene. However, not even his friend Mable could corroborated this story. Labonia then testified that Aczel attempted to kick Mable. Mable did not corroborate this testimony.

Labonia further testified that the pepper spray did not affect Aczel, but he then contradicted himself and admitted that Aczel was having problems seeing after being pepper sprayed. Labonia first admitted that he had testified at his deposition that he had not determined whether Aczel committed a crime prior to placing Aczel in the cruiser because he had to make an investigation. Labonia also admitted testifying at his deposition that he did not know if Aczel was a threat prior placing Aczel in the cruiser the first time because he had to do investigation. At trial, Labonia contradicted this deposition testimony by testifying that Aczel committed the

crime of breach of peace, prior to being placed in the cruiser the first time.  He also admitted that during his previous testimony at his deposition,  he testified that Aczel committed sexual assault in the fourth degree.  Labonia testified, at trial, however, that Aczel committed the crime of interfering with a  police officer's duty.  Labonia did not mention the crime of sexual assault in the fourth degree during his direct examination.  Aczel was not charged with sexual assault in fourth degree. Labonia admitted that he did  not tell Aczel what the charges against him were going to be until after Aczel was processed.  It is reasonable for a jury to have inferred that at the time of the arrest, Labonia had no idea what the charges were going to be.  It is reasonable in light of all the contradictions in Labonia's testimony that the jury did not believe Labonia to be a credible witness.

Aczel testified that he overhead the officers talking and they were debating as to what they would charge him with and one officer said "Don't worry I'll fix it".  It is reasonable for a jury to infer that is exactly what happened, these officers attempt to cover up the beating by charging Aczel with breach of peace and interfering with a police officer, by accusing Aczel of being drunk, and the officer ran with the story.  It is reasonable for a jury to have inferred in light of the evidence that the officers even made an attempt to charge Aczel with  sexual assault in fourth degree but they could not get anybody to lie for them and therefore they did not charge Aczel with this crime.  The officers took Aczel to the hospital to document their fabricated tale that Aczel was drunk.  It is reasonable for a jury to have believed this, after all, there was no treatment rendered to Aczel at the hospital with respect to the broken bones.

## IV. TESTIMONY OF ETHAN MABLE

The evidence showed that Ethan Mable places himself at the scene of the incident, as the first officer to arrive after Labonia, and while Labonia and Aczel were still on the ground. After the arrival of additional officers, Aczel testified that he was kicked and pepper sprayed. Therefore, the evidence showed that Mable was at the scene, prior to the kicking of Aczel by the officers and prior to the time that Labonia pepper sprayed Aczel. Mable had an opportunity to intervene and protect Aczel but he did not.

Mable did not see Aczel kicking, hitting, punching, pushing, or shoving Labonia when he arrived at the scene. Mable testified that he previously gave deposition testimony wherein he testified that he said saw struggling but could not define what that meant. He testified that during his prior deposition testimony, he was not able to articulate any specific acts by Aczel that he observed. It is reasonable for a jury to infer that what Mable saw was not a struggle but what he saw was a "beaten" Aczel who could not get up from the ground unassisted, could not stand by himself unassisted and could not walk unassisted.

Mable testified that within a matter of seconds of his arrival on the scene, Labonia had Aczel on his feet. Labonia testified that Aczel was resisting arrest, that he had to pepper spray him in order to attempt to control him but that the pepper spray did not work, and yet within seconds of Mable's arrival to the scene, Labonia had Aczel on his feet. It is reasonable for a reasonable jury to disbelieve Labonia's testimony charging Aczel with resisting arrest.

Mable's testimony is quite instructive. He testified that he could not say for certain that Aczel was drunk. On the other hand, Labonia said he noticed Aczel was drunk from the very second he stepped onto the scene of the incident. Those are two stark contradictions. It is reasonable for a jury to conclude that Aczel was not drunk on the date in question and to have believed Aczel's testimony on this issue.

Mable testified that he not receive any scratches, bruises as a result of incident. It was reasonable for the jury to find that Aczel was not combatative on the date in question and that excessive force was used on him.

## VI.  THE TESTIMONY OF VERONICA DEROSA STEFANO

The evidence showed that DeRosa had no real memory of the incident in question. She claimed that she watched the incident from the 2nd floor window furthest from the street on Davis Street, but could not even articulate with any clarity which window she was watching from.

Significantly, she never saw Labonia punch Aczel despite the fact that Labonia admits this. She was quite "hesitant" in stating that Aczel used profanities on the date of the incident. At first, she testified that Aczel used "no" profanities on the date of incident, and then after Defendant's attorney repeatedly questioned her, she testified that Aczel "did not really use much profanities" on the date of incident. She contradicts Labonia on this point.

Significantly, Veronica, Aczel, Labonia, and Fesh all testify that Labonia was sitting on top of Aczel, with either Aczel's belly to ground or Aczel's body in fetal position when Labonia

pepper sprayed Aczel.  It was reasonable for the jury to find that excessive force was used when

Labonia pepper sprayed Aczel.


**ARGUMENT:**

Rule 50 of the Federal Rules of Civil Procedure, entitled "Judgment as a Matter of Law

in Jury Trials; Alternative Motion for New Trial; Conditional Rulings",  provides as follows:

(a) Judgment as a Matter of Law.
(1) If during a trial by jury a party has been fully heard on an issue and there is no
legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue,
the court may determine the issue against the party and may grant a motion for judgement
as a matter of law against that party with respect to a claim or defense that cannot under
the controlling law be maintained or defeated without a favorable finding on that issue...
(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.  If, for
any reason, the court does not grant a motion for judgment as a matter of law made at the
close of all the evidence, the court is considered to have submitted the action to the jury
subject to the court's later deciding the legal questions raised by the motion.  The movant
may renew its request for judgment as a matter of law by filing a motion no later than 10
days after entry of judgment–and may alternatively request a new trial or join a motion for
a new trial under Rule 59.  In ruling on a renewed motion, the court may: (1) if a verdict
was returned: (A) allow the judgment to stand, (B) order a new trial, or ( C) direct entry
of judgment as a matter of law; or (2) if no verdict was returned; (A) order a new trial, or
(B) direct entry of judgment as a matter of law.

Federal Rule of Civil Procedure 50 (a) and 50 (b).


"The jury's role as the finder of fact does not entitle it to return a verdict based only on

confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented

at trial." Goldhirsh Group v. Alpert, 107 F.3d 105, 108 (2d Cir. 1997) (quoting Michelman v.

Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042(2d Cir. 1976)).  Accordingly, a Rule

50 motion for judgement as a matter of law must be granted where "(1) [t]here is such a complete absence of evidence supporting the verdict that a jury's findings could only have been the result of sheer surmise and conjecture, or (2) [t]here is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Newmont Mines Ltd. V. Hanover Ins. Co., 784 F.2d 127, 132 (2d Cir. 1986).

"It is well established that a district court should not grant a motion for judgment as a matter of law except on a showing of 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture'. Samuels, 992 F.2d at 14 (internal quotation omitted). In considering a motion for judgment as a matter of law, the district court 'must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor'. Purgess v. Sharrock, 33 F.3d 134, 140 (2d Cir. 1994). In this regard, the district court is not to 'assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury'. Mattivi v. South African Marine Corp., 'Huguenot', 618 F.2d 163, 167 (2d Cir. 1980)." In re Joint E. & S. Dist. Asbestos Litig., Docket No. 93-7829L (2nd Cir. 1995). See decision attached hereto and marked Exhibit A. See also, Raspente v. National R.R. Passenger Corp., 111 F.3d 239 (2nd Cir. 1997) and cases cited therein.

Thus, this court must determine whether, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of Plaintiff, a reasonable jury could only have found for the Defendants, Samuels, 992 F.2d at 14.

In their Memorandum, Defendants impermissibly fail to view the evidence in the light most favorable to Plaintiff, and Defendants fail to grant Plaintiff the requisite favorable inferences as required by law.

In viewing the evidence in the light most favorable to Plaintiff, drawing all inferences in Plaintiff's favor, as we must, a reasonable jury could find that the officers used excessive force on Aczel and that Defendant officers are not entitled to qualified immunity. In fact, the jury, in this case articulated for us what it did find. The jury in this case articulated that excessive force was used. The jury in this case articulated that it made an award of damages. The jury in this case articulated that its verdict was a compromise verdict. No speculation can be made regarding the verdict form. The jury verdict with respect any and all matters itemized on the verdict form was admittedly a compromise verdict (including damages). The jury told us this. We, therefore, can not draw any conclusions as to what facts the jury found by analyzing this admittedly compromise verdict. The jury in this case articulated that it deliberately found excessive force, damages and qualified immunity as a compromise verdict. The jury told us they were not aware that they could not both award damages and find an entitlement to qualified immunity. The court explained to the jury that if the jury found that the officers were entitled to qualified immunity, the jurors must delete the damages part of the verdict. The court, specifically, instructed the jury to return to their deliberations and delete the damages part of the verdict and place the foreman's initials next to the deletion. The jury, after several attempts, flatly refused to delete damages in this case. There was obviously a lack of consensus among the

jury with respect to the question as to whether the officers were entitled to qualified immunity. They could not agree on this issue and that is why they did not delete damages as the court instructed.   After further deliberations, the jury returned and stated that they wished to change their responses to the other questions on the Verdict Form. Thus, the jury probably  decided to avoid the dilemma posed by the court's instructions with regard to their compromise verdict by amending their verdict to find for the Plaintiff and  award damages under the state counts of, assault and battery, emotional distress, false imprisonment, or abuse of process, so as to avoid the qualified immunity question altogether.  The Court informed the jury that they could not do this, because the court had already accepted that part of the verdict.  The jury told us, however, that their verdict was a compromise verdict.  Therefore, we can not draw any conclusions as to the facts found by the jury when they compromised and decided in favor of Defendants on the state law counts.  The jury re-acknowledged the fact that their verdict, as to all counts against all Defendants, was a compromise when they requested to change the portion of the verdict that had already been accepted by the Court.

In the circumstances presented, we must view the facts and draw all inferences in favor of plaintiff.  In so doing, there was testimony to support that Aczel did not use profanity, that Aczel, at all times complied with Officer Labonia's commands, that Aczel did not resist arrest, that Aczel did not resist being handcuffed, that Aczel did not punch Labonia, that Aczel was chocked by Labonia,  kneed to the ribs by Labonia, kneed to the head by Labonia, pepper sprayed by Labonia in Mable's presence,  and kicked by at least 4 legs. See the Facts portion of this brief

which articulates with specificity the evidence in this case.  Plaintiff testified as to all these facts.

Also, in addition to all the matters testified to by Aczel, Labonia testified that he punched Aczel.

The medical records and Aczel's testimony also document each and every injury suffered by

Aczel.  Therefore there was sufficient evidence for the jury to find all or some of  these facts,

including the fact that Aczel was chocked, kneed, pepper sprayed, kicked and punched.

We can not draw any conclusions form the fact that the jury did not find against Mable on

any one count of the complaint against him, because the jury stated to us that the verdict was a

compromise verdict.

The court instructed the jury that an officer would be entitled to the absolute defense of

qualified immunity if "he had a reasonable objective belief that the force used was reasonably

necessary". When the jury rendered an inconsistent verdict, the judge told the jury that they could

not find both an entitlement to qualified immunity and damages.  The court instructed the jury

to delete damages as part of their verdict.  The jury refused to do this because they did not agree

that the officers were entitled to qualified immunity.  The jury requested to change that part of

the verdict that had already been accepted by the Court.  The jury told us that their verdict was

a compromise verdict.  The jury may very well have wanted to change their verdict with respect

to counts directed at Defendant, Mable or with respect to other counts directed at Defendant,

Labonia.  No conclusions can be drawn from a compromise verdict.  Defendant's argument that

the Court polled the jury as a group and each member nodded in assent (Plaintiff disagrees that

the jury as a group each nodded in assent)  that they agreed they had found Officer Labonia had

proven his entitlement to the affirmative defense of qualified immunity is of no significance because the jury told us that it was a compromise verdict based on their misunderstanding that they could  nonetheless award Plaintiff damages.

Defendants in their Memorandum of Law in Support of Renewed Motion for Judgment requests at page 11, that based on the jury's findings, the court should conclude that the force employed was not excessive as a matter of law.  But the jury specifically and repeatedly told us that they found that the officers used excessive force.  What the jury could not agree on was whether qualified immunity absolved the officers from liability.  In fact, the jury requested to change its responses to the state law counts so that they could find excessive force, award damages, and avoid the qualified immunity question altogether.

Plaintiff objects to Labonia's Renewed Motion for Judgment and requests that the Court deny the Motion.  Plaintiff has set forth the evidence in this case which was admitted at trial in the Facts portion of this brief.  There is sufficient basis for a jury to have found in favor of Plaintiff and against each of the two Defendants on all counts of the complaint.  Because the verdict was a compromise we can not conclude any facts to have been found by the jury. Plaintiff incorporates herein, as if more fully set forth, the arguments it made in its Motion and Memorandum of Law in Support of Plaintiff's Motion for a New Trial dated December 22, 2005, as of record.

THE PLAINTIFF

By: /s/ Tiziana M. Scaccia_____Tiziana M.
Scaccia  ct08713
GOLDSTEIN AND PECK, P.C.
1087 Broad Street, P.O. Box 1538
Bridgeport, Connecticut  06601
(203) 334-9421/(203) 334-9421
E-mail:scacciat@goldsteinandpeck.com

## **CERTIFICATION**

This is to certify that the above was mailed or electronically delivered this __10th__  day of
January 2006 to all counsel and pro se parties of record:

Thomas R. Gerarde, Esq.
John J. Radshaw, III

HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, CT 06114-1190

                    THE PLAINTIFF,
                    JOHN ACZEL

            By:   /s/Tiziana M. Scaccia
                    Tiziana M. Scaccia, Esq.
                    GOLDSTEIN AND PECK, P.C.
                    1087 Broad Street
                    Bridgeport, CT 06601-1538
                    Tel: (203) 334-9421
                    Fax:(203) 334-6949
                    Fed No. ct08713
                    E-Mail:scacciat@goldsteinandpeck.com